In the Interest of W. H. J., Jr., a child
under seventeen years of age.

No. 58268.

Supreme Court of Missouri,
Division No. 1.

July 22, 1974.

C. Herschel Bryant, Legal Aid Society, Liberty, for appellants.

Abe Shafer, of Witt & Shafer, Platte City, for respondent; William D. Lay, Guardian ad Litem, of counsel.

HIGGINS, Commissioner.

Appeal by natural parents of child from denial of petition to revoke consent to adoption, asserting presence of questions involving construction of the Constitution of the United States and of this state. Jurisdiction on that ground is, at most, arguable; however, the case involves the welfare of an infant and his relationship to his parents and others, and it is retained for decision in the interest of an early resolution of those interests. See Order, Supreme Court en banc, April 9, 1973.

On June 21, 1972, the Juvenile Officer of Platte County, Missouri, by leave of court, filed a petition in the Juvenile Division of the Circuit Court in the interest of W. H. J., Jr., born March 17, 1972, of Parkville, Platte County, Missouri.

The petition alleged that the child was in need of care and treatment, and without care, custody and support, in that each of the natural parents of the child executed a verified consent to adoption of their child and consent to termination of their parental rights.

The consents were attached to the petition. They were executed separately and acknowledged before a notary public and were identical in form except that one identified the father as parent of the child and the other identified the mother as parent of the child. The mother's consent follows:

"KNOW ALL MEN BY THESE PRESENTS, That I, (―――――), of the County of Platte and State of Missouri being the mother and only surviving parent having any right or claim to certain named child W. H. J., Jr. born on the 17 day of March, 1972, a minor, do hereby place said child under the jurisdiction of the Juvenile Court of Platte County, Missouri, to be dealt with under the laws of the State of Missouri in such cases made and provided, and to be placed by it in a good family home for adoption and in consideration of care and maintenance and adoption, I here-

by relinquish all claims and rights in said child.

"I hereby further consent at any time hereafter to any decree of adoption of the above named child that may at any time hereafter be made by such Juvenile Court of Platte County, Missouri, or by any Court of competent jurisdiction within the State of Missouri, I understand that by such decree of adoption all rights I may have as a parent of said child shall be terminated and that the person or persons adopting said child under said Court decree will secure all personal rights to and over said child. I hereby enter my appearance, waive any notice or summons relating to said adoption as may be required by law, and give consent to the adoption of said child decreed at any time by any court of competent jurisdiction, above set forth.

"Witness my hand and seal, this 21 day of June, 1972.

"(Mother) /s/ ———— Seal

"STATE OF MISSOURI
"COUNTY OF PLATTE

"On this 21 day of June, 1972, before me personally appeared [mother], to me known to be the person described in and who executed the foregoing instrument and acknowledged that she executed the same as her free act and deed.

"In Witness Whereof, I have hereunto set my hand and affixed my official seal on this 21 day of June, 1972.

"/s/ Lorene Cox
"Notary Public"

Pursuant to the petition, the Juvenile Court entered this order:

"Now on this 21st day of June, 1972, it appearing to the Court that a Petition for corrective treatment of W. H. J., Jr., a child under Seventeen (17) years of age, has been filed * * * and

"It further appearing to the Court that an emergency situation exists in that said child is in need of immediate care and treatment, and that the best interests and welfare of said child require immediate care and treatment under the supervision of the Court, and that care, custody and control of said child be immediately removed from his parents, * * * it is

"ORDERED, ADJUDGED AND DECREED that care, custody and control of said child be, and is hereby removed from his parents and transferred and awarded to the Missouri Division of Welfare, Platte County Office, for foster home placement, pending hearing upon the Petition filed herein, or until further Ordered by the Court."

On June 29, 1972, the paternal grandparents filed a petition praying in Count I for transfer of custody of the child for purposes of adoption, and in Count II for adoption of the child.

On July 19, 1972, the natural parents filed their petition to revoke their consents to adoption of W. H. J., Jr.

On January 18, 1973, the cause came on for hearing.

The father of the child was 19 years of age, having been born September 29, 1953. He had been living for about a month with his wife in a 4-room apartment in Riverside, Missouri, for which he paid $16.50 per week. He had been employed for "almost two weeks" at Dolgin's Warehouse in North Kansas City at $1.75 per hour.

The father met his wife in January, 1970, during his freshman year in high school. About six months after they started dating, they became engaged to be married. Neither party's parents would consent to the marriage; however, the parties accomplished the marriage August 13, 1971, with the wife then being two months' pregnant with the child in question.

The father served in the United States Army, entering the service in February, 1971, at age 17. "I thought if I had a steady position, income and good steady background that my parents would let us

get married." The consent did not follow and, after 3½ weeks in service, he went AWOL. "I wanted to get out and get a job, and then I could get my wife pregnant so that we could get married." He was AWOL for 175 days, after which he was arrested, placed in the stockade for a month, and given an undesirable discharge.

In June, 1969, the father was taken into juvenile custody for car theft. "I kept running away from home * * * so I could get away from there. I never did manage it, so I stole a '55 Chevy so I would get sent away, and they put me on probation and the day after * * * I stole a '67 Mustang, and they finally sent me to a mental institution for mental evaluation." After the mental evaluation, which took about a month, he was placed in the State Training School at Boonville.

The child in question was born March 17, 1972, at Salt Lake City, Utah. " * * * my parents used to live out there when I was a kid, and I liked it out there, so, to get away from both our families and live our own lives we moved out there." He and his wife were there for three months before the baby was born. The church helped with rent and groceries. They returned to Missouri when their child was three weeks old. " * * * we come back to show off the baby [and the car] and just to get away."

The father was unemployed upon the return to Missouri. He and his wife first discussed adoption of their child about June 5, 1972. "It was mainly my idea. She thought I knew what I was doing, so she went along with it." On June 8, 1972, they went to the Platte County Welfare Office and the mother applied for assistance. " * * * we tried to apply for welfare before and couldn't get it as long as I was able to work. And the fact that I couldn't seem to find a job didn't make any difference. So, * * * I represented myself as my younger brother, which I

don't have, and told them that her husband had left." The mother then qualified for welfare assistance.

On June 21, 1972, "we called Mr. Werline at the Platte County Welfare, and he came down and talked to us about making him a ward of the court and trying to get him back after we were on our feet. And he talked to us about temporary papers, so we went ahead and applied it on the permanent procedure. And he said in most cases they don't file the papers for three months, and that way the mother has a chance to change her mind, and they generally do, and they just tear up the papers and nothing more is said about it. And I think we signed some type of paper at the apartment, and then we went to the Welfare Building in Platte City and signed the waivers and got them notarized."

In December, 1971, before the movants went to Salt Lake City, "I had lost a job and I did have a checking account, and my wife was pregnant, and so to keep up the food and rent I wrote checks and was planning on paying them back after I got another job, * * * but I didn't get another job * * * so I cashed two separate $50.00 checks * * * and we went to Colorado." When the movants returned from Salt Lake City, the father was arrested on felony charges involving the checks and, upon reduction of the charges to misdemeanors, was sentenced to 30 days in jail, placed on probation, and ordered to make restitution, which he was presently trying to do.

The father completed ninth grade after his commitment to Boonville. He also tried a trade school under Missouri State Employment to learn automobile mechanics. He was dropped after a week when he was arrested for being AWOL. His work experience also included shoe repair at the training school, clearing brush at Watkins' Mill honor camp, trash hauling, mechanic, and assistant manager at a Hudson Oil Station from which "they laid me off for poor attendance."

In the event the court permitted movants to revoke their consent, they would live in the 4-room apartment in Riverside where they had a baby bed and would have a supply of baby clothes "from a friend whose kid is not old enough to wear them yet. And we're planning on going up to Goodwill to get some." The mother was not planning to work.

The father remained unemployed in June, July, and August, 1972. He and his wife went to California after signing their adoption consents. They returned in August, and he remained unemployed until the current job at Dolgin's. Welfare secured an apartment for his wife and provided funds for her. She also obtained some food from Human Resources. Welfare also obtained an apartment for him and secured a minister to provide some food and clothing.

With respect to the adoption, the father told Mr. Werline he "really believed in the interest of the child's welfare he would be better off. * * * I specifically specified that I would like him to be taken by parents who were of the religion I was." He read his consent to the adoption of the child before signing it and he understood that the child would be taken and he would never see him again. The nature of the total relinquishment was explained to him by Mr. Werline. He changed his feeling while in Sacramento, California. "* * * my wife kept bugging me about the papers, about getting our son back, * * * so we stayed down there a couple of days and hitchhiked right straight back to get him." His wife also signed her consent voluntarily. "By voluntarily, nobody forced her to, but she thought it was either lose me or him, so I guess she decided on keeping me." When he gave up his child, "we hadn't even had time to get attached to him at all," and he had not seen him since relinquishing him for adoption.

Movants were expecting another baby about September, 1973. They had no medical or health insurance and had made no arrangements for doctor and hospital bills.

The mother was 17 years of age, having been born July 15, 1955. She had completed 10th grade at North Kansas City High School. She and her husband discussed the adoption of their child. "* * * we both talked about it, and I kind of went along with him. * * * I could either leave him or have me 16 with a baby, and I would rather stay with him, because the baby wouldn't get very much from a girl 16 having a baby. So I figured well, if I didn't sign it B. would never get a job * * * but since then he has proven he could get a job and support our baby, so we decided to have another baby since then so little B. wouldn't get spoiled if we got him back." She had understood that Mr. Werline "tried to get us to sign temporary papers, but we wouldn't sign those. * * * I went along with B. on what papers to sign, and he said parental rights would be dismissed, so I just signed the papers B. signed." When she returned from California, she called the welfare office and talked to a lady there about getting her baby back because the 3-month period mentioned by Mr. Werline was still running. The lady advised "that Mr. Werline couldn't have possibly said that, and that we couldn't get the baby because his parents had cross-filed against our waivers." They were sent to legal aid because "we couldn't afford a lawyer * * *." If the baby were returned to her, "we still have one of the checks yet to pick up, and we can buy diapers with that, and I have a box of clothes already at home for him, and we still have a play pen, and I can obtain the baby bed."

The mother made the call to the welfare office that precipitated the consents. "I called Kathleen Dowd and ask [sic] her to send somebody out so we could sign papers for relinquishment of our parental rights." She understood her child would be placed for adoption if taken by the Welfare Department and that she did not have to sign any papers unless she wished to do so. Mr. Werline arrived at their home later that day. She was in the apartment and

her husband came upstairs later. He had stayed downstairs "so Mr. Werline wouldn't know that B. was the same person as J. D. * * * we discussed temporary papers, and he said before we signed any papers at all * * * he talked about that he had had cases where parents, mostly single women, had signed papers, and within the three months period had come back and got their [child]." Mr. Werline explained "temporary papers until we got on our feet" and permanent papers which would allow the child to be adopted. We chose to and "did sign the adoption proceedings papers." When she signed and acknowledged the consent, Mr. Werline advised "we were releasing our parental rights to the baby," and she told Mr. Werline she understood the consequences of her act. She felt it would be in the best interest of her child if he were adopted.

When the mother went to the welfare office July 3, 1972, to discuss her change of mind, she was taken to the office by her mother. Her husband "went out duck hunting."

When the mother signed the consent, "nobody forced me. I did it because I thought that was what was right at the moment, because I couldn't do it myself, and without B. I wasn't going to be able to do it either at that time."

Susie Strasser, child welfare worker, first met movants June 8, 1972, when the mother, accompanied by the father identifying himself as a brother-in-law, applied for public assistance. "* * * I felt like it was an emergency case because she and her baby didn't have anywhere to go, so we called Senergy House and made arrangements for her and the baby overnight, and for the weekend. * * * we called Human Resources and found some formula for the baby."

Kathleen Dowd, Family Service Supervisor, also talked with movants June 8, 1972. She determined the subject to be public assistance and referred movants to Mrs. Strasser.

On June 21, 1972, the mother called and asked to have someone come to Parkville, and stated that she wanted to place the baby for adoption. "I don't recall the details of the conversation, but * * * I reacted with some bit of shock. This was an unexpected request * * *. The telephone conversation was short, so I'm sure we said no more than maybe are you sure this is what you want to do, have you thought about this, and do you know there are other things could be done. * * * Her response was no, we want to place the baby for adoption." She referred the mother to Mr. Gene Werline and sent him to investigate.

Mrs. Dowd had an interview with movants December 21, 1972. "On that date they had been here to the courthouse to speak to Judge Yeaman, * * * and they came down then to talk to Gene Werline, who was not available, so I took the interview. They ask [sic] about the baby, and how he was. They then went on to tell me that they wanted the baby back, which, of course, we were aware of, and that Mr. Werline had told them at the time relinquishment papers were signed, during the interview, that he told them they could —that he could tear up the papers, and the term 'tear up' was repeated several times by Mr. J. I explained to them that he may have used the term in trying to explain to them some aspect, but I was also sure that he had told them that the termination papers that they signed were very final, and that they could not have the baby back, that this meant that their rights were terminated as parents."

Mrs. Dowd elaborated on her shock. "The shock came not from that it was so terribly unusual * * * but that there had been no precedent in our contact with these kids to indicate that they had any thought of this."

Mrs. Dowd explained also that it was customary in the procedures of the Platte County Welfare Office to allow teeenagers to give up their parental rights without

making a contact with any of their adult relatives, and that there was no such requirement.

Gene Werline, family assistance worker in the Platte County Welfare Office, met with movants at one o'clock, June 21, 1972, at their apartment in Parkville. "Mrs. Dowd, * * * my supervisor, received a call from Mrs. J. stating that she wanted to give her baby up for adoption, and Mrs. Dowd ask [sic] me to go to the apartment and talk with them and suggested that I should suggest other areas of helping them instead of placing the child for adoption. * * * I went to the apartment and knocked on the door, and no one was home, so I started back down the steps and Mrs. J. and the baby came in the door. We went back upstairs and she placed the baby on the bed, and she sat on the bed, and I found a chair in the room, and she stated that her husband had come back from California, that they had talked it over and decided that they wanted to place the child for adoption. And I told her that we would be glad to accept relinquishment papers and place the child in an adoptive home if that was what they really wanted, but I felt that there were other areas we should explore. And I suggested that perhaps the child could be placed in a foster home to be made a ward of the court, and that in the process we would be able to work with her, help her finish her education or help her find a job, and when she felt that she was stable and the court felt that she was able to care for the child, then the child could be returned to her. And it was about this time then that there was a knock on the door and B. came in. He was introduced to me as her husband, and I repeated to him the same thing that I had told her. And he said 'no,' that he thought the best thing was for the child to be placed for adoption, because he had come home and had decided that they were going to get a divorce, and he was going back to California and he didn't think that she had the emotional or financial ability to care for the child. And I suggested to

him that perhaps they should wait awhile and talk it over, and he said 'no', he had to get back to California that night, and they had made their mind up and this is what they wanted to do. * * * She had nothing to say while he was talking. * * * When I suggested other * * * she stated, 'no', that she felt the child would be better off in an adoptive home where it could receive love and the material necessities of life. She didn't feel that she would be able to provide these. I then proceeded to ask them questions about their background, and B. stated that he had been in trouble since he was 14 years old, that his sisters were both dropouts from school, that he couldn't get along with his Mother, that he had been arrested several times, and that after he and R. had started going together that he had gotten her pregnant primarily so that he could get away from home, because he couldn't stand it at home. He realized now that he was not mature enough to be married, that he was not mature enough to raise a child, and that he felt the best thing would be for him to get a divorce and for them to place the child for adoption. And I told them that the papers had to be signed by a Notary Public, and I didn't know of any Notary Public in Parkville and that we had to go to Platte City. And when I started talking about going to Platte City he started mentioning, talking about his brother, J. D., and I said, well then, if you have a brother why didn't you mention him a while ago when I was getting the family history and you told me about your sisters, and he said 'well, I forgot about my brother, but he is exactly like me, we look almost like twins', so we loaded the child's clothing in the car and drove to Platte City, and I came by the Juvenile Office to see the Juvenile Officer, because to me it was an unheard of thing to just relinquish a child, and I wanted as much information on it as I could, and I was sort of amazed at the matter of fact way in which they handled the thing, there was no show of emotion on either one when we were talking about signing these papers * * * so I took

them to the Welfare Office, they sat in the waiting room * * * and when we got the forms typed up then I ask [sic] one of the secretaries if she would take the baby to the back room. She went to Mrs. J. and Mrs. J. gave her the baby and she took the baby out of the room then and then Mr. and Mrs. J. signed the relinquishment papers in the presence of a Notary Public. * * * I told them that these were the relinquishment papers, and that they should read them over, and I gave them each a copy in order that they could read them, and I ask [sic] them if there were any questions, and at the time B. read the paper he said, in this paragraph 'I hereby further consent at anytime hereafter to any degree of adoption of the above-named child', and he questioned what this meant in particular, and I told him at that time that the papers that he was signing would mean a final termination of parental rights. * * * After they signed the relinquishment papers I ask [sic] them if they had any way to get back to Parkville or what they were going to do, and they said they had no way back, so I told them I would drive them back to Parkville. And I was still concerned with the fact that they seemed to be willing to sign these papers without any emotion or concern about the child, so on the way back to Parkville I told them I will hold the papers until tomorrow morning before I turn them in to the court, and you be sure and call me first thing in the morning, and neither one of them made any response as to whether they would or whether they wouldn't. I took them back to their apartment and let them out." Mr. Werline at no time told movants they would have three months in which to reconsider and withdraw their consent.

"On the following Monday Mr. J's Mother and Father came to the office asking where the child was, and his Father stated that it was generally the custom of the children to bring the baby by their place on weekends and they would keep the baby on weekends for them, and this pre-vious weekend they didn't come, and so they made some calls and finally found that they were in Riverside, and Mr. J's Father stated that he tried to get B. to tell him what he had done with the baby, and B. refused, so the Father went to the Police, the Riverside Police, and they talked with B. and told him that he should tell his Father what he had done with the child, and so he told him then that they had come to Platte City and signed relinquishment papers, and the Grandparent then stated that they would like to adopt the child and ask [sic] for information. And I suggested that they secure a lawyer, which they did, and then on July 3rd R. came to the Welfare Office with her Mother, and she stated that she had come to pick up the baby, and I told her that the baby was in a foster home, that he was a ward of the court, that she could not get the child, and she wanted to know what she could do, and I suggested that she get a lawyer, and she said she didn't have the money to hire a lawyer, and I suggested that she go to Legal Aid. * * * About two weeks later I received a request from Judge Yeaman to do a home study, and so I went to their home, the home of R's Mother in Riverside. * * * I finally tracked them down through different people at the trailer court and found out which trailer they were in and was able to talk with them. At that time they were living in a trailer, a small trailer, I assumed one bedroom, and R. said that she and B. were sleeping on the couch in the front room, and the other occupants of the trailer, R's Mother and her 21 year old Daughter—the trailer had no screens on the window, there was [sic] quite a few flys [sic] in the trailer, it was clean, and at the time R. was fixing dinner, and I talked to them concerning their feelings of the child, and R. stated that she would like to have the child back, and that they planned on living in the Brenner Ridge Trailer Court area, and I ask [sic] her why she felt this would be— why they wanted to continue to live there, and she said she thought it would be a good place to raise a child, because there

would be many children for it to play with. I ask [sic] B. about his feelings about raising the boy, and he said that he wouldn't raise a child the way he had been raised; that he would be willing to listen to a child and let them have their own—make their own decisions, and when his Son got in high school if he wanted to drop out of school for a year why he felt that the child should be allowed to do so to let him find out for himself how hard it was to get along. They both indicated that they would be able to raise the child, and indicated that they wanted the child back. And then on * * * a subsequent visit about a week later, I was in the home and found that B. was in jail, and talked with R. for awhile, and told them to keep in contact with me, and then the next time I went to the trailer court about a week later, and I talked to R's Mother and she said they had moved into another trailer and I couldn't find anyone at home, and it was then that I lost contact with them. * * * I ask [sic] them if they had talked with their parents about this, and R. stated that she had talked with her Mother about it, and her Mother said it would have been much better if you had given the child up the minute it was born, if you wanted to give it up for adoption, but it is your child and it's a decision that you'll have to make. And B. ask [sic] me when I said have you talked with your parents about this, he said 'are you going to see my parents' and I said 'no, as far as I'm concerned this is your child and it is your responsibility to decide whether you want to keep the child or not, and at this time I am not going to say that I will see your parents about it.'"

Upon conclusion of the hearing the court entered an order by which the petition of the paternal grandparents was denied and dismissed. No appeal was taken from this order.

The court also ordered that the motion of the natural parents of W. H. J., Jr., to revoke the consent to adopt W. H. J., Jr.,

be denied and rendered judgment accordingly. This appeal followed.

This judgment shall not be set aside unless clearly erroneous and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. Rule 73.01(d), V.A.M.R.

Appellants contend (I) that the judgment is erroneous because: (1) no application under Section 453.050(1), RSMo 1969, V.A.M.S., for permission to waive necessity of their consent to future adoption of their child was ever filed by appellants; (2) appellants were misled by the welfare assistance worker as to length of time in which they could revoke their consents; (3) the Welfare Department did not properly advise and guide appellants; and (4) sufficient time had not passed for ties of affection to develop between the child and any prospective adoptive parents.

They contend (II) that the refusal to permit them to revoke their consents to adoption of their child has, in effect, terminated their parental rights, and, in so doing, denied them equal protection of the law, because: (1) Anyone can now adopt appellants' child without notice to them under Sections 453.040(3) and 453.060(1), RSMo 1969, V.A.M.S.; and (2) the procedure for termination of parental rights, Section 211.441 et seq., RSMo 1969, V.A.M.S. was not followed.

The fundamental question presented by appellants' contentions is whether the court abused its discretion in refusing movants leave to revoke their consents to adoption of their child.

Section 453.040, RSMo 1969, V.A.M.S. provides that consent to the adoption of a child is not required of "(3) A parent of a child or the mother of a child born out of wedlock who has waived the necessity of his or her consent to a future adoption of the child."

Section 453.050 provides:

"1. The juvenile court may, upon application, if it appears wise, permit a parent

of a child * * * to waive the necessity of * * * consent to a future adoption of such child.

"2. Any waiver mentioned in subdivision (3) of section 453.040, or the written consent to adoption by any parent, shall be valid and effectual even though such parent was under the age of twenty-one years at the time of the execution thereof, and any such waiver or consent shall be irrevocable without leave of the court having jurisdiction of the child given at a hearing, notice of which has been given to all interested parties."

■ Examination of appellants' consents leaves no room for doubt that they are not applications for waiver of necessity of their consent to a future adoption of their child as mentioned in Section 453.050(1); and it is equally clear that they are outright written consents to adoption as mentioned in Section 453.050(2). It is also clear from the consents that all claim and rights to the child with respect to adoption, termination of parental rights, or whatever action the court might order, were relinquished, and that any notice or summons that might otherwise have been required were waived.

Such consents were irrevocable without leave of court; and when movants filed their motion for an order permitting the revocation of their consent, the matter was subject to the court's sound discretionary action. In re Mayernik, 292 S.W.2d 562, 569[5] (Mo.1956); §§ 453.050(2), supra, 453.110, RSMo 1969, V.A.M.S. Accordingly, there was no error for failure to have an application to waive necessity of consent under Section 453.050(1), supra.

■ There can be no question on this record that the court accorded a hearing on the motion to revoke consents; and any question of notice to interested parties was mooted by movants' appearances and testimony to the record. Appellants' assertions I(2) and (3) gave rise to questions of fact which the court resolved against movants on conflicting evidence; and, upon this review, deference is accorded the trial court's superior opportunity to view the witnesses while testifying. Appellants' assertion I(4) was perhaps true at the time of trial some ten months after the birth of the child in question. It is equally true that no ties of affection attached between the child and its parents in the hectic 4-month relationship shown by the evidence. This matter, too, was for resolution by the court on the conflicting evidence.

The consents recite also that the consenting parents did so voluntarily, and the evidence shows that they did so voluntarily and that they understood the consequences of their actions.

■ In short, under the law, Section 453.050(2), supra, and on this record, it may not be said that the trial court was guilty of an abuse of discretion in denying movants leave to revoke their consents to adoption of their child. To reverse the court's order and permit revocation of the consents given in this case would dilute to disappearance the significance of "irrevocable" as used in the statute. In re Adoption of Hecker, 448 S.W.2d 280, 287 (Mo.App.1969); In re Mayernik, supra.

■ With the case in this posture, it is true, as asserted by appellants' Point II (1), that movants' child may be adopted without notice to them because their consents on file relieve of the necessity to serve a summons and petition on them. § 453.060.1(1), RSMo 1969, V.A.M.S. With respect to their assertion II(2), there is nothing on this record to indicate the presence of any proceeding requiring the court to follow Sections 211.441 et seq., RSMo 1969, V.A.M.S.

Two citations by appellants deserve distinction. Fackerell v. District Court of Adams County, 133 Colo. 370, 295 P.2d 682 (banc 1956), holding that consent alone does not confer jurisdiction to grant adoption, was under Colorado law which requires a petition to a county or juvenile court and a hearing thereon before a parent can relinquish a child. This requirement is comparable to Section 453.050.1, RSMo 1969, V.A.M.S.; however, Colorado does not appear to have a provision in the

nature of Section 453.050(2), supra, upon which this case turns.

Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), held that a divorced father had been denied due process of law because he had no notice of the adoption proceedings involving his child. The father had not consented to the adoption and it was necessary to jurisdiction to an adoption by the mother and her second husband that it be alleged and proved that the natural father had not contributed to the support of the child for a period of two years. Obviously, he was entitled to notice on this fact issue absent an unqualified consent to the adoption. Compare Sections 453.040(4) and 453.060.1(2) providing that summons and service must be made on a parent in an adoption where the jurisdictional allegation is abandonment or neglect existing for at least a year.

Judgment affirmed.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court.

All of the Judges concur.