**In the Interest of L.W.F., Minor,**

**John DiMuccio and Linda DiMuccio, Petitioners–Appellants.**

**No. 17496.**

Missouri Court of Appeals,
Southern District,
Division Two.

Nov. 13, 1991.

Lynn E. Heitman, Springfield, for petitioners-appellants.

MAUS, Judge.

By their two-count petition in customary form, John DiMuccio and Linda DiMuccio seek to adopt L.W.F. That petition incorporates the attached consent of the mother, S.L.L., to an adoption. The alleged putative father denied paternity but consented to that adoption. The trial court denied the mother's motion to revoke her consent. The mother has not appealed. The trial court denied the prayer of Count I to transfer legal custody of L.W.F. to the petitioners. The child was placed in the custody of the Juvenile Officer. The petitioners appeal.

L.W.F. was born to S.L.L. on January 2, 1987 [1]. At that time, S.L.L. was married to K.B.F. A decree dissolving that marriage was entered on December 19, 1989. That decree awarded custody of their child, B.D.F., to the husband, K.B.F. The decree also declared that K.B.F. was not the father of L.W.F.

The evidence of the mother's circumstances subsequent to the dissolution of her marriage is sketchy. She worked at a laundry. However, in October of 1990, she was injured. The nature and extent of her injury is not shown. At the hearing upon her motion to withdraw her consent held on February 27, 1991, she had not returned to work.

After the dissolution of her marriage, S.L.L. was having a difficult time in providing care for L.W.F. In early 1990, she started thinking about placing L.W.F. for adoption. At an uncertain time in 1990, she called her mother, who lived in California, and asked her mother to provide care for L.W.F. for a few months. Her mother declined to do so. Her mother said that petitioners John DiMuccio and Linda Di-

---

1. The December 19, 1989 Decree of Dissolution declared L.W.F.'s birth date as January 2, 1987. The Petition, Denial of Paternity, Voluntary Re- linquishment of Parental Rights and Consent to Adoption all list L.W.F.'s birth date as January 2, 1988.

Muccio, who also lived in California, were interested in adopting a child. She suggested that S.L.L. might contact Linda. Linda DiMuccio is a maternal cousin of S.L.L.

S.L.L. called Linda DiMuccio. S.L.L. testified that she talked to Linda about keeping L.W.F. Linda replied that she and her husband were interested in adopting L.W.F. S.L.L. said she told Linda she did not want anyone in the family to adopt the child.

Linda testified to a different account of the conversation. She said S.L.L. called her in the summer of 1990 and said she heard that Linda and her husband were interested in adopting L.W.F. Linda said they were. The mother said her only stipulation was that her father, W.L., the maternal grandfather, should have no dealings with the child. S.L.L. further told Linda that all that was necessary for the adoption was for S.L.L. to sign a form and for Linda to pick up the child at a coffee shop. Linda said she would check on this procedure. Linda did consult an attorney, who advised that this was not the proper procedure for an adoption. Linda then told S.L.L.'s mother that she and her husband would pursue an adoption only in a lawful manner.

S.L.L. had known R.K.N. for three or four years. R.K.N. was a business associate and "girlfriend" of the maternal grandfather, W.L. S.L.L. discussed with R.K.N. the possibility of permitting L.W.F. to be adopted. Finally, in the fall of 1990, she told R.K.N. she had decided to do so.

On September 11, 1989, S.L.L. executed a Power of Attorney. By its terms, this instrument appointed R.K.N. as S.L.L.'s attorney to provide care for L.W.F. and to "have any and all powers that I myself have as natural and legal parent of said child; with the exception of the power to consent to the marriage or adoption of the child." See § 475.024. Shortly after executing this instrument, S.L.L. placed L.W.F. in the custody of R.K.N. In explaining her purpose, the mother testified:

"The purpose was, I was not able to support my child. I—You know, I wasn't able to care for him at all. And she was—I was entrusting her to take,

you know, care of him, healthwise, you know, clothingwise, everything. And she was, in turn, going to keep him until an—the adoption was final."

In later testimony, she said that the adoption was not to be by any member of her family. After L.W.F. was in R.K.N.'s custody, R.K.N. called Linda and advised her of that fact.

The circumstances which resulted in the preparation of the petition for adoption and S.L.L.'s consent for adoption are not clearly developed in the record. The office of the petitioners' attorney and that of R.K.N. and W.L. adjoined. The attorney and R.K.N. were acquainted. R.K.N. gave the petitioners the attorney's telephone number and told them the attorney would prepare the adoption papers for the petitioners. She further advised the petitioners to call the attorney if they wanted her to proceed. The attorney prepared a Power of Attorney, the petition for adoption and the consent to adoption.

The two-count petition is substantially in customary form. See Mo. Juvenile Law, § 9.77 (MoBar 1985, 1988). It is styled "In the Circuit Court of Greene County, Missouri" and bears an appropriate caption. It refers to and incorporates by reference the consent to adoption hereinafter described. The petition was executed in San Bernardino County, California on September 20, 1990.

The attorney also prepared an instrument entitled "Voluntary Relinquishment of Parental Rights and Consent to Adoption." After the preliminary recitals, the instrument provides that S.L.L. "hereby voluntarily relinquishes her parental rights to the minor child L.W.F., born January 2, 1988, and consents to the adoption of said child." That instrument was executed in Greene County, Missouri on September 11, 1990.

The petition for adoption, with the attached consent, was filed in the Circuit Court of Greene County on September 24, 1990. On October 17, 1990, S.L.L. executed an instrument entitled "The Waiver of Issuance and Service of Process and Voluntary Entry of Appearance." By that

instrument, she entered her appearance in the above-styled cause. It was filed on October 18, 1990.

That instrument, and the voluntary relinquishment of parental rights and consent to adoption, were headed "In the Circuit Court of Greene County, Missouri." Each bore the caption "In the Interest of L.W.F., male, born 01/02/88." Neither instrument included the name of the petitioners in the action.

In November 1990, Linda DiMuccio visited in R.K.N.'s home in Springfield for a few days to get acquainted with L.W.F. Then, R.K.N. and L.W.F. and Linda DiMuccio went to the DiMuccio home in California. After a few days, R.K.N. left L.W.F. with the DiMuccios and returned to Springfield. In December 1990, R.K.N. and W.L. went to California. One purpose of the planned trip was to return L.W.F. to R.K.N.'s home in Springfield. They had been advised that he should not remain in the petitioners' custody for more than thirty days until approval by the court. R.K.N. and W.L. did visit in the DiMuccio home. R.K.N. testified that John DiMuccio was upset because W.L. was there on Christmas. S.L.L. said that she had been told that the DiMuccios did not want W.L. to have any contact with the child. R.K.N. and W.L. returned to Springfield on December 26, 1990. They did not return with L.W.F., as the attorney had advised them a home study was underway. A hearing on Count I had been set for February 28, 1991.

S.L.L. first testified that when she signed the Power of Attorney and the Consent, she was told the adoptive parents "were a friend of Mrs. Heitman's and [Mrs. Heitman] knew these people that wanted to adopt and were quite well off and could afford it." S.L.L. later testified that when she signed those instruments "I didn't understand that the adoptive parents were already picked out." She testified that she told R.K.N. she did not want the child adopted by any member of her family. S.L.L. said the attorney knew this. S.L.L. felt this way because no one in her family had a college education and no one in her family would insist on the child going to college.

R.K.N. testified that she was aware of this direction of S.L.L. Nevertheless, she placed the child with the petitioners for adoption. She discussed this with W.L., but kept it secret from S.L.L. R.K.N. testified that as the date for the hearing approached, she determined that she had to tell the mother who really had the child for adoption. She testified:

"A. When I realized that—Well, I got the—got bad vibes that all the agreements between Mr. [W.L.] and the DiMuccios was all falling apart...."

She was referring to an understanding that W.L. could maintain contact with the child. So, she and W.L. went to the mother's mobile home and told her that the DiMuccios were the petitioners for adoption and had custody of the child.

On February 21, 1991, S.L.L. filed a motion to set aside her Voluntary Relinquishment of Parental Rights and Consent to Adoption. This motion was heard on February 27, 1991. In support of that motion, S.L.L. testified that she had always stipulated that the child could not be adopted by any member of her family. She stated this was because her family had not insisted that any child in the family go to college. She wanted L.W.F. back in her custody until other adoptive parents could be found. She still consented to an adoption by suitable parents.

R.K.N.'s testimony at the hearing on the mother's motion to withdraw included the following:

"Q. And to your knowledge, has [S.L.L.] ever requested any money or financial assistance from the DiMuccios or anybody else?

A. I am not aware—Anything that—You know, they said—I'm not really sure what they said. So, you know, I would really rather not, you know, comment.

Q. You don't know?

A. Yeah."

The subject was not further pursued.

At the conclusion of the testimony, the court took a five-minute recess. When court reconvened, the court announced:

"Mother's motion to withdraw her consent is denied. I don't think there is any

reason that I need to re-explain what I explained to the attorneys.

Mr. Epperly, [Juvenile Officer] you will have to do what you have to do."

Later, the court explained:

"Well, Mr. Epperly is going to take the child into protective custody because he is in Greene County with no lawful custodian . . . ."

The basis for this order is not established by the record. See *State ex rel. T.W.N. v. Kehm*, 787 S.W.2d 728 (Mo.App.1989); *State ex rel. L.L.B. v. Eiffert*, 775 S.W.2d 216 (Mo.App.1989).

On March 6, 1991, W.L., the maternal grandfather, filed a motion to intervene in the action and a petition for transfer of custody and adoption. The record before this court does not include the petition for transfer and custody and adoption filed by W.L. The court is unable to determine if that petition was based upon the consent of S.L.L. or upon the grounds of abandonment or neglect. The mother also filed a motion to intervene. The motions to intervene were denied.

A hearing upon Count I of the petition for adoption was had on March 7, 1991. The only witness was Linda DiMuccio. Her testimony, and the record, establishes the following.

Linda DiMuccio was 35 years of age. John DiMuccio was 36 years of age. They had been married for sixteen years. It was the only marriage for each. They wanted children, but had none.

John DiMuccio is a pipe fitter foreman. His work included work on a space shuttle and a nuclear plant. His income for 1990 was $47,531.00. He contemplates retirement and going into business for himself.

Linda DiMuccio attended a community college and received a Quality Control Certificate. She worked for approximately 15 years for General Dynamics. Her work included inspector analyst and procurement quality control engineer.

She quit work with General Dynamics about one and one-half years before the hearing. She then studied floral design and works part time as an accountant for a floral shop. She refused to return to work for General Dynamics because she felt that the child needed her care. The DiMuccios have been able to arrange their working hours so that L.W.F. is not left with a baby sitter. The DiMuccios own a home in California. The exhibits demonstrate that it is a spacious and attractive home in a residential neighborhood. The DiMuccios have also purchased a summer home in Arizona.

L.W.F. has lived in the DiMuccio home since November. When he first came to that home, he had problems. He was self-abusive. He didn't eat well. He didn't sleep well. He had difficulty playing with other children in the neighborhood. Since living in their home, he has become more adjusted. He eats and sleeps well. He plays more with the children in the neighborhood. He is more open and loving. L.W.F. has a separate room in the DiMuccio residence. He is well supplied with toys and facilities. Photographs demonstrate that he seems adjusted and happy in the company of the DiMuccios.

Linda DiMuccio further testified that she and her husband wanted very much to adopt and raise L.W.F. If L.W.F. wants to attend college, they will send him. She testified there had been no problem with W.L.'s visiting and there would not be. She further testified that if there were a problem because W.L. and S.L.L. know the DiMuccios' identity as adoptive parents, they would move and even change their name. However, they plan to raise L.W.F. so that he knows he is adopted. He calls the DiMuccios "Mommy" and "Daddy". He calls S.L.L. "Old Mommy".

The adoptive parent home study and supplemental report were favorable to the DiMuccios as adoptive parents and to the adoption. The guardian ad litem of L.W.F. strongly recommended the transfer of custody and adoption in the following terms:

"And, you know, I feel strongly, number one, that in a huge mess, that they are victims of a set of circumstances that came about. And I don't think that there is any fault on their part. That's number one.

Number two, I feel strongly that there is an attachment between the child and

them, a strong attachment existing over that period of time. And that was evidenced to me by my interview with Mr. DiMuccio with the child for an hour. It's quite obvious that he relates well to the child, and there is good feelings there and good things happening.

Number three, I feel strongly that this family would be outstanding for a child. I really think that they would put the time and effort and energy into it. They have already endured, what, more than most of us are ever asked to step up and do. And I—Despite all the problems—And there are significant problems—I do feel strongly that the best interests of this child would be served by these people having him."

As stated, the petitioners appeal from the trial court's refusal to transfer legal custody of L.W.F. to them. This refusal effectively denies their adoption of L.W.F. and is an appealable judgment. *Matter of Williams,* 672 S.W.2d 394 (Mo.App.1984); *Matter of M.D.H.,* 595 S.W.2d 448 (Mo.App. 1980). In essence, the petitioners contend that refusal should be reversed because it is not in the child's best interests.

■ The basic standard for appellate review in this case is that enunciated in *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). *In re Adoption of W.B.L.,* 681 S.W.2d 452 (Mo. banc 1984). However, the application of that standard must be correlated with established principles concerning how the evidence is to be viewed and concerning the consideration of voluntary findings by the trial court. In this case, the evidence concerning the circumstances relative to the petitioners and their custody of L.W.F. is undisputed. Nor is it subject to internal inconsistencies. Rule 73.01, in part, provides:

"(c) On appellate review:

\* \* \* \* \* \*

(2) Due regard shall be given to the opportunity of the trial court to have judged the credibility of witnesses." Rule 73.01(c)(2).

That deference to the trial court is embodied in the standard enunciated in *Murphy v. Carron, supra.* This deference recognizes the right of the trial court to reject the testimony of any witness, even though that testimony is undisputed. *Burden v. Burden,* 811 S.W.2d 818 (Mo.App.1991). Nevertheless, there are limitations upon basing appellate review upon the supposition that a trial court rejected undisputed and consistent testimony. Such deference is not applicable when the facts have been submitted by stipulation. *State ex rel. White v. State Highway Com'n,* 655 S.W.2d 860 (Mo.App.1983). That principle is also the foundation for the following observation.

"Moreover, where the facts are derived from the pleadings, stipulations, exhibits, and depositions, *MFA Mutual Insurance Co. v. Home Mutual Insurance Co.,* 629 S.W.2d 447, 450 (Mo.App.1981), or where the evidence is not controverted and 'the case is virtually one of admitted facts,' *Murphy v. Doniphan Telephone Co.,* 347 Mo. 372, 147 S.W.2d 616 (1941), and *State ex rel. Wenneker v. Cummings,* 151 Mo. 49, 52 S.W. 29, 31 (1899), or where the evidence is not in conflict, *Eckle v. Ryland,* 256 Mo. 424, 165 S.W. 1035, 1038 (1914), and *General Electric Co. v. Interstate Electric Co.,* 204 S.W. 933, 934 (Mo.App.1918), no deference is due the trial court's judgment. Where credibility of witnesses is not involved, the rule of deference mandated by Rule 73.01(c)(2) is not applicable. *Case v. Universal Underwriters Insurance Co.,* 534 S.W.2d 635, 637 (Mo.App.1976)." *Southgate Bank and Trust Co. v. May,* 696 S.W.2d 515, 519 (Mo.App.1985).

In respect to administrative proceedings the following rule is applicable.

"An administrative agency may not arbitrarily disregard or ignore the testimony of a witness not shown to have been disbelieved by the agency and only if the agency makes a specific finding that the undisputed or unimpeached evidence is not entitled to credibility and is unworthy of belief may that evidence be disregarded. *Jennings v. Labor & Industrial Relations Commission,* 579 S.W.2d 845, 848 (Mo.App.1979); *Wilson v. Labor and Industrial Relations Commission,* 573 S.W.2d 118, 121 (Mo.App.1978)." *Stevinson v. Labor & Indus. Rel. Com'n of*

*Mo.*, 654 S.W.2d 373, 374–75 (Mo.App. 1983).

Also see *Turner v. Labor & Indus. Rel. Com'n*, 793 S.W.2d 191 (Mo.App.1990). It is not necessary to determine if that principle is applicable to appellate review in this case. The trial court's statement of the grounds of its decision establishes that it did not reject the consistent and undisputed evidence, but accepted the same.

That being so, the question posed on review may be stated alternatively. Is the conclusion of the trial court against the weight of the evidence? Or, did the trial court erroneously apply the law to undisputed facts? *In re Adoption of W.B.L.*, supra. The difference is academic.

■ The parties did not request the trial court to provide a statement of the grounds for its decision nor findings on controverted fact issues. There are cases that make the following statement.

"Voluntary findings of fact and conclusions of law, present no question for review other than as a general finding, and an appellant may not assign as error a specific finding of fact or conclusion of law, or the lack thereof. *Wills v. Alcorn*, 636 S.W.2d 142, 144 (Mo.App. 1982)." *Motley v. Colley*, 769 S.W.2d 477, 479 (Mo.App.1989).

Also see *M___ D___ v. C___ D___*, 691 S.W.2d 406 (Mo.App.1985). However, that statement does not recognize the controlling authority on this subject.

"We believe that the better rule is that when no request is made of the court in a court-tried case to make specific findings of fact or conclusions of law and they are voluntarily given, such findings and conclusions do form a proper basis for assigning error and should be reviewed. Any holding to the contrary is hereby overruled." *Graves v. Stewart*, 642 S.W.2d 649, 651 (Mo. banc 1982).

Also see *In re Marriage of Bell*, 796 S.W.2d 130 (Mo.App.1990); *Behen v. Elliott*, 791 S.W.2d 475 (Mo.App.1990). The voluntary statement by the trial court of the grounds for its decision certainly may be considered in determining what evidence, if any, it rejected. It may also be considered in determining if the trial court misapplied the law to the undisputed evidence.

The undisputed evidence has been summarized. Upon taking the matter under advisement, the trial court expressed its concern over the fact that the natural mother and grandfather knew the identity of the adoptive parents and might harass them. Also, the trial court was concerned because its denial of the mother's motion to withdraw her consent might be reversed on appeal. After expressing the latter concern, the trial court stated:

"... I'm just telling you the things that I have got to consider. It's not—As I say, I don't doubt, if you were here, and it was in my power to find you a child, I have no doubt that you would be perfect parents."

■ There can be no doubt that the fact a natural parent and relatives have knowledge of the identity of adoptive parents is a factor to be considered in granting an adoption. At one time, it was the generally-accepted opinion it was essential there should be no relationship between the natural parent and relatives and the adoptive parents. "Human nature being what it is, the greater the number of people who share a secret, the less the likelihood that the information will remain in that category." *In re K.W.S.*, 370 S.W.2d 698, 704 (Mo.App.1963). But that attitude has been relaxed. Cochran, 21 Mo.Prac., Family Law, § 23 et seq. See also Haralambie, *Handling Child Custody Cases* (Family Law Series), § 15.18 (1983 and 1990 Cum. Supp.). "Open adoptions" are being approved by decision and authorized by statute. Annot., *Open Adoptions*, 78 A.L.R.4th 218 (1990). Also see *Matter of Patricia Ann W.*, 89 Misc.2d 368, 392 N.Y.S.2d 180 (N.Y.Fam.Ct.1977); *Matter of Adoption of Jennifer*, 142 Misc.2d 912, 538 N.Y.S.2d 915 (N.Y.Fam.Ct.1989). This shift of opinion, however, does not mean such knowledge is not a factor to be considered. It does place such knowledge of identity in perspective so that it is not an overriding or controlling factor irrespective of other circumstances.

■ There is no statutory standard for transferring custody with a view to adoption. "The transfer of custody the juvenile division is authorized to order in an adoption proceeding is a transfer incident to the requested adoption. It is 'a proper preliminary procedural step in adoption proceedings.'" *State ex rel. L.L.B. v. Eiffert*, 775 S.W.2d at 219. Inasmuch as a period of custody of at least nine months will ordinarily result in a degree of bonding between the child and adoptive parents, legal custody should be transferred when the circumstances at that time indicate a decree of adoption will be entered. § 453.-080.

Section 453.080 provides that a decree of adoption should be entered if "it is fit and proper that such adoption should be made".

■ Section 453.030.1 provides:

"In all cases the approval of the court of the adoption shall be required and such approval shall be given or withheld as the welfare of the person sought to be adopted may, in the opinion of the court, demand."

These statutes authorize adoption when it is in "the best interests of the child." *Matter of Williams*, 672 S.W.2d at 395. The factors to be considered in determining what is in the best interests of the child are legion. They vary from case to case. It is impossible to catalogue all the factors that may be involved. It is virtually impossible to assign a degree of weight to specific favorable and unfavorable factors. With the exception of an extreme adverse factor, no single factor can be absolute. *In Interest of J.L.H.*, 647 S.W.2d 852 (Mo.App. 1983). Each case must be considered upon its own facts. Compare the weighing of the factors in the majority opinion and dissenting opinion in *Matter of B.J.K.*, 573 S.W.2d 382 (Mo.App.1978).

Highly significant factors favoring adoption have been summarized:

"The paramount consideration in adoption cases, as held in a long line of decisions, is the best interests of the child or children, and that is the matter to which this case descends for resolution. See, e.g., *State ex rel. Catholic Char. of St. Louis v. Hoester*, 494 S.W.2d 70, 74[8]

(Mo. banc 1973); *In re Adoption of P.J.K.*, 359 S.W.2d 360, 368[15, 16] (Mo. App.1962), and cases cited; and note the considerations applied to the child custody case, *In Interest of J.L.H.*, 647 S.W.2d 852, 859[8–10] (Mo.App.1983) [a good environment and a stable home; good care; a 'bonding' with the custodial parents and the child; and a two-person home with one person being available for supervision]." *In re Adoption of T.E.B.R.*, 664 S.W.2d 609, 613 (Mo.App.1984).

Also see *In re Marriage of Carter*, 794 S.W.2d 321 (Mo.App.1990).

■ In weighing the factors involved, the alternatives for the future of the child must be considered. In this case, the alternatives are not between competing petitioners. Nor are they between a natural parent and the petitioners. S.L.L.'s consent to adoption was not in the form of a consent to a future adoption. See § 453.050. But, the trial court has determined that the mother's consent to an adoption cannot be withdrawn. That was an appealable judgment. *In re Adoption of ADA*, 789 S.W.2d 842 (Mo.App.1990). S.L.L. did not appeal and that judgment is final. *In Interest of W.H.J.*, 511 S.W.2d 795 (Mo.1974). The alternatives are between an adoption by the DiMuccios and placement in a foster home for an unknown future. The situation of L.W.F. is much the same as the child in *Matter of Williams*, supra. In a concurring opinion, Judge Smith sagaciously analyzed the status of a child in that situation.

"First, it appears to me that whenever the rights of the natural parents have been terminated, whether by consent or otherwise, it is in the best interests of the child that it be adopted. The court's discretion therefore does not run to whether an adoption should take place but whether the adoption as proposed is in the best interests of the child.

Second, I am unaware of any doctrine that requires a court to determine that the placement sought is in the 'best' home available as indicated by the dissent. The function of the juvenile court is not to compare a series of adoptive

parents and homes and place the child in the one it determines is 'best' (if in fact any such determination can objectively be made). Its function is to determine whether the proposed adoptive parents provide a good stable home and environment for the child. A natural child is not even guaranteed that much. The record here clearly demonstrates such a home and environment in this case." *Matter of Williams*, 672 S.W.2d at 396.

■ It is obvious a natural mother's knowledge of the identity of the adoptive parents must be considered. But as stated, an adverse inference from such knowledge cannot be the basis for the rejection of a proposed adoption irrespective of other relevant factors and the alternatives available to the court. To accord such knowledge that weight would bar adoptions based upon a natural parent's consent to an adoption by designated adoptive parents, § 453.-030.3, as distinguished from a consent to a future adoption under § 453.050. It would often bar adoptions based upon a natural parent's neglect or abandonment. § 453.-040. When other factors and considerations are favorable, adoptions have been consistently approved even where a natural parent has knowledge of such identity and opposed the adoption. *In re Adoption of T.E.B.R.*, supra; *In re Mayernik*, 292 S.W.2d 562 (Mo.1956); *In re G.K.D.*, 332 S.W.2d 62 (Mo.App.1960). Also see *Matter of M.D.H.*, supra; *In Interest of J.L.H.*, supra.

The undisputed evidence is that there has been some bonding between L.W.F. and the DiMuccios. The DiMuccios offer a good environment, a stable home and a two-person home with one person being available for supervision. See *In re Adoption of T.E.B.R.*, supra. Written statements from their neighbors are lavish in their endorsement of the DiMuccios as prospective adoptive parents. Indeed, the trial court observed "I have no doubt that you [the DiMuccios] would be perfect parents." The home study and supplemental report were favorable. The strong recommendation of the guardian ad litem has been noted.

Possible future harassment by the natural mother and her father does not pose an absolute bar to the adoption by the DiMuccios. Such possible future harassment is subject to a degree of control. That possible future harassment does not outweigh all of the favorable aspects of the proposed adoption so as to consign L.W.F. to an unknown future. To accord the mother's knowledge that weight is an erroneous application of the law. Cf. *Matter of Williams*, supra.

The judgment of the trial court denying Count I is reversed. The cause is remanded for the entry of judgment granting the petitioners legal custody of L.W.F. and for the implementation of the transfer of actual custody to the petitioners, and for further proceedings not inconsistent with this opinion.

FLANIGAN, C.J., and SHRUM, P.J., concur.

MONTGOMERY, J., recused.