In re The ADOPTION OF T.E.B.R. and M.R., Jr., Minors.

Dewey R. ELLINGTON and Shirley R. Ellington, Respondents,

v.

S.R., Natural Mother, by James P. AYLWARD, Jr., Guardian of the Person and Estate of S.R., Incompetent, Appellant.

No. WD 34340.

Missouri Court of Appeals, Western District.

Jan. 17, 1984.

Larry J. Ruhl, Kansas City, for appellant.

Stuart J. Newman, Kansas City, for respondents.

Before PRITCHARD, P.J., SHANGLER, J., and TURNAGE, C.J.

PRITCHARD, Presiding Judge.

In these adoption proceedings the natural mother, who was born June 27, 1958, is blind, deaf and practically mute. On July 5, 1963, she was struck by a gravel truck which, according to the Social Report of the Missouri Division of Family Services, caused these injuries: severe cerebral concussion and contusion, bilateral blindness, skull fracture, clavicle fracture, multiple abrasions and contusions and post-traumatic convulsive seizures. In November of that year she was re-admitted to the University of Missouri Medical Center with a diagnosis of meningitis, which resulted in a total loss of hearing.

The case was heard by the Honorable Edward Pendleton, Commissioner, who entered the decree of adoption, which decree was confirmed by the Honorable Jack E. Gant, Judge of the Juvenile Division pursuant to § 211.029, RSMo Supp.1980.

The mother met the father of the children, M.R., Sr., while they were both in-patients at the Western Missouri Mental Health Center, and they were married on January 13, 1980. The female child, T.E. B.R., was born on November 17, 1979, and the male child, M.R., Jr., was born on November 10, 1980. On July 14, 1982, the

natural father of the children signed consent forms for their adoption.

The mother has been in a series of institutions. She possesses average intelligence, and has developed a unique and fluent style for finger spelling as a method of communication. Dr. Steven J. Soper, a staff psychiatrist at Western Missouri Mental Health Center, had been treating the mother since April or May, 1982. Her diagnoses have generally been adjustment disorders or mild depressive-type states, and having personality disorders, a fixed pattern of abnormal social behavior and relationships with other people which has an origin in an organic injury or condition. Her adjudication of incompetency was on the basis of extreme disorders of social behavior and judgment, and not because of any evidence of profound psychotic disorder or a clear psychotic disorder or condition. "She becomes increasingly angry, demanding, aggressive, antagonistic with most stimuli, is very unpredictable. And this is seen to occur under all situations. She may have periods of time which may last for a few days, or even a week or two, when she has seemed pretty cooperative and perhaps manageable. But this has never lasted long enough to establish any working relationship with her." She is capable of caring for herself intellectually and in most parameters, but not as far as her social judgment and behavior. She not only could not care for herself but she would not be able to care for her children. Dr. Soper would not recommend that the mother be restored to competency. Quite clearly no previous institutional treatment had benefitted the mother, but there was hope that a Kansas institution would admit her to see whether it could work with her.

On cross-examination, Dr. Soper acknowledged that the mother was intelligent, with a relatively high IQ, a good memory, and she could form an intent. She had recently been on a medication, thorazine, which controlled her aggressiveness to some extent. It is not likely that she will improve in the future.

Social service worker, Tom Schroeder, had been assigned to the mother's case for two years. The female child was removed from her care two days after her birth, and the male child was likewise removed on November 30, 1980, he being hospitalized to that date after his birth on November 10, 1980. Neither child has ever been in the care of the natural parents. In Tom's communication with the mother, she was able to say one or two words, but normally it was by finger spelling or by writing on a piece of paper. The Ellingtons were the foster family for the children, to whom the children relate well as their parents. The relationship of children to the mother is adverse—they are frightened of her. The children visited with the mother on a fairly regular basis once a month. From his observance of her, Tom was of the opinion that there had been no change in her behavior over the years, and there was no possibility that she could ever care for the children herself, or that she is capable of taking care of herself. It was his further opinion that in the best interests of the children, the adoption should be granted.

The mother was declared incompetent on January 20, 1981, and Mr. Aylward, Public Administrator, was appointed guardian of her person and estate. He favored continuation of foster care instead of adoption of the children because he did not know whether the mother would be restored and whether there could be found therapeutic aids which would be beneficial to her.

Kenneth M. Luther, appellant's witness and psychologist, did a recent evaluation of the mother, giving her situational tests which she performed well. He judged that she had an IQ of 110 to 120, 35% above the average. He thought she was a very gifted person, with an excellent memory, recalling Luther from a meeting three years prior by examining his ring and watch, and parts of his two fingers which were missing. He thought that there are programs which she could enroll in which would increase her ability to take care of her children and to adapt to them, but he could not make an opinion as to what extent therapy would take her.

Mrs. Ellington testified that she and her husband received custody of the children as licensed foster parents shortly after their births. They have the ability properly to care for, maintain and educate the two children, who know them as "Mom and Dad". They love the children and desire to adopt them. According to the Adoptive Study Report, the Ellingtons have been foster parents to several children in the last eight years, and have adopted two of them. Both Mr. and Mrs. Ellington, although an older couple, are in good physical, mental and emotional health. He is a machine operator with a gross income of about $19,500 per year. She is a housewife. They have a bungalow three bedroom house in rural Oak Grove, Missouri. They have been married since 1967. The female child is six to twelve months delayed in her development, and is receiving speech and occupational therapy at Truman Medical Center East once a week for one-half hour. She also attends a pre-school two hours a day for four days a week. The male child is about nine months delayed in speech and language development. There is one other foster child in the home. Neighbors of the Ellingtons speak well of them, and the social worker, as well as the guardian of the children herein, and recommended that the adoption be granted.

Section 453.040, RSMo 1978, provided, "The consent of the adoption of a child is not required of (1) a parent who has been adjudged to be incompetent; * * *." This statute was amended by Laws 1982, p. 433, H.B. Nos. 1171, 1173, 1306 and 1643, § 1 [Effective August 13, 1982], deleting the ground of incompetency for consent, supra, and providing: "The consent of the adoption of a child is not required of (1) a parent who has a mental condition which: (a) Renders him unable to form an intent or act knowingly; and (b) Is shown by competent evidence to be permanent or that there is no reasonable likelihood that the condition is reversible, and such parent has substantially and repeatedly neglected the child or failed to give the child necessary care and protection; * * *."

By her first point, appellant contends that § 453.040(1) RSMo 1978, providing that consent to adoption shall not be required of a parent who has been adjudged incompetent, which was in part applied by the court, unconstitutionally deprived her of her right to appear, present evidence and be heard on the issue of her competency and fitness as a parent, and that the absence of her consent deprived the trial court of jurisdiction over the subject matter. She argues that the lack of opportunity to show fitness as a parent renders the statute fatally defective, and thus it is apparent that she is attempting to show the invalidity of the statute. The trouble is that appellant did not preserve the constitutional question for review because she did not present it at the earliest opportunity, i.e., in the trial court. A long line of cases set forth that rule, e.g.: *Atkins v. Department of Bldg. Regulations, City of Springfield,* 596 S.W.2d 426, 433[1] (Mo.1980); *Tintera v. Planned Indus. Expansion Authority,* 459 S.W.2d 356, 358[1, 2] (Mo.1970); *Hopkins v. Hopkins,* 626 S.W.2d 389, 394[13, 14] (Mo.App.1981), and cases cited; and note *State v. Danforth,* 654 S.W.2d 912, 925 (Mo.App.1983), adhering to the rule in criminal cases. No constitutional question is presented, and the trial court clearly had the jurisdiction to apply § 453.-040, RSMo 1978. Point I is overruled.

By Point II, appellant contends that the trial court erred in applying the standards of § 453.040(1), RSMo 1978, rather than the amended statute, § 453.040, Laws 1982, supra, in that the petition for adoption was filed August 2, 1982, the amended statute went into effect August 13, 1982, and trial was had November 1, 1982. The question is whether the amendment is prospective or retroactive (to the date the petition was filed). What appellant is really contending is that she should have the advantage of the amended statute which eliminates the provision that no consent for adoption is required of a parent who has been adjudged incompetent.

The legislature has not manifested a clear intent that the 1982 amendment to § 453.040 be applied retrospectively. See

State ex rel. *Lawyers Title Ins. Corp. v. Elrod,* 636 S.W.2d 396, 397[2] (Mo.App. 1982), citing *State ex rel. St. Louis-San Francisco Ry. Co. v. Buder,* 515 S.W.2d 409, 410 (Mo. banc 1974). An exception to the non-retroactive effect of a legislative enactment is where it is procedural only. See, e.g., *State ex rel. Research Med. Center v. Peters,* 631 S.W.2d 938 (Mo.App.1982) [holding that a statute of limitations change on the time to sue for wrongful death was procedural, and plaintiffs had the benefit of the extension of the time to sue provided by the new statute]. Note also the there cited and quoted case [page 947] of *Clark v. Kansas City, St. L. & C.R. Co.,* 219 Mo. 524, 118 S.W. 40, 43 (1909), holding in part, " 'Where a new statute deals with procedure only, prima facie it applies to all actions—those which have accrued or are pending and future actions.' " The provision here under the former statute that no consent to adoption is required where a parent has been adjudged an incompetent is not procedural only. Rather, it is substantive, in the sense that respondents, in filing their petition for adoption had a right to rely upon the then statute dispensing with consent, a right which was then vested in them. The 1982 amendment, therefore, did not have any effect upon the status of the parent as impairing the substantial right to petition for adoption absent a consent where the natural parent was alleged to have been, and was proved to have been, adjudged to be an incompetent. The legislature, in the former statute, dispensed with the necessity of consent in this circumstance.

■ The fact that appellant was adjudged to be an incompetent which dispenses with the issue of consent is comparable to a parent or parents who voluntarily consent to an adoption—the trial court is thereby possessed of jurisdiction to determine whether the best interests of the children would be served by granting the proposed adoption. The paramount consideration in adoption cases, as held in a long line of decisions, is the best interests of the child or children, and that is the matter to which this case descends for resolution. See, e.g., *State ex rel. Catholic Char. of St. Louis v.*

*Hoester,* 494 S.W.2d 70, 74[8] (Mo. banc 1973); *In re Adoption of P.J.K.,* 359 S.W.2d 360, 368[15, 16] (Mo.App.1962), and cases cited; and note the considerations applied to the child custody case, *In Interest of J.L.H.,* 647 S.W.2d 852, 859[8–10] (Mo.App. 1983) [a good environment and a stable home; good care; a "bonding" with the custodial parents and the child; and a two-person home with one person being available for supervision]. In this case, the record shows that the Ellingtons do have and will maintain a good environment and a stable home (and the children will have the benefit of association with other children therein). The children are being given good care, with attention directed toward their mental development and education (in counselling with professional persons in respect thereto, as the record shows). Mrs. Ellington, a housewife, is constantly available for the children's supervision. A parental relationship between the adoptive parents and the children has already been established. When these factors are measured against the evidence of the natural mother's severe physical condition, her emotional disturbances, and what appears to be a dim prospect of improvement, together with the fact that she cannot care for herself or the children, or provide them with a suitable home, it is inescapable that their best interests will be served by affirming the trial court's decree of adoption. There was substantial evidence on that issue, the decree was not against the weight of the evidence, nor did it erroneously declare or apply the law, and the welfare of the children does not demand some other disposition.

■ The trial court, however, erred in applying portions of the 1982 amendment to § 453.040, supra, in that there is no evidence, as it held, "that the natural mother has a mental condition which renders her unable to act knowingly and is shown by competent evidence that there is no reasonable likelihood that the condition is reversible, and the natural mother has failed to give the child (sic) necessary care and protection." As noted, Dr. Soper testified that the natural mother could form an intent. This indicates to the contrary that she could not act knowingly. The gist of his testimo-

ny is that there would be no likelihood of her improvement from her personality disorders, a fixed pattern of abnormal social behavior and relationships with other people, only. That had no relationship to any issue of her being unable to act knowingly. The latter finding that the natural mother failed to give the child (children) necessary care and protection must relate to a willful or neglectful failure, and there is no evidence of that. The evidence shows that the natural mother has been institutionalized for many years, and since January, 1981, she has had a guardian appointed of her person and estate. Thus, she could not have the means, physically or financially, to care for the children, because any funds she might have had available would have been under the control of her guardian. The decision herein rests merely upon the basis that the natural mother had been adjudged incompetent, thus obviating the necessity of her consent to the adoptions, and that she is incapable of caring for the children in a suitable environment in their best interests.

The judgment is affirmed.

All concur.