### In the Interest of M.F.

### H.W.C. and M.V.N., Appellants,

### v.

### D.A.H., Respondent.

### No. WD 56538.

Missouri Court of Appeals, Western District.

July 6, 1999.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1999.

Application for Transfer Denied Oct. 26, 1999.

Cheri C. Simpkins, Kansas City, Guardian Ad Litem.

Sandford P. Krigel, Kansas City, for appellants.

David Spencer, Kansas City, for respondent.

Before BRECKENRIDGE, C.J., ULRICH and HOWARD, JJ.

BRECKENRIDGE, Chief Judge.

This case involves two competing petitions to adopt M.F., a minor female child. The petitions were filed by H.W.C. and M.V.N., a married couple unrelated to M.F., and M.F.'s paternal aunt, D.A.H. (Aunt). H.W.C. and M.V.N. appeal the trial court's judgment denying their petition to adopt M.F. and granting Aunt temporary custody of M.F. H.W.C. and M.V.N. claim that the trial court erred in (1) excluding the testimony of a licensed clinical social worker regarding the degree of bonding and attachment between themselves and the child and the effects of disrupting that bonding and attachment; (2) excluding the testimony of M.F.'s biological father regarding his relationship with his family and his opposition to Aunt's adoption of M.F.; (3) requiring written offers of proof; (4) denying H.W.C. and M.V.N.'s motion to dismiss Aunt's petition for adoption for lack of jurisdiction; (5) making several findings of fact which were unsupported by the evidence and against the weight of the evidence; (6) failing to consider crucial factors in determining M.F.'s best interests; (7) giving inappropriate weight to certain factors in determining M.F.'s best interests; and (8) exhibiting bias and prejudice in favor of Aunt and against H.W.C. and M.V.N. which precluded a fair weighing of the evidence.

Because this court finds that the trial court lacked subject matter jurisdiction over Aunt's petition to adopt M.F. and its judgment denying H.W.C. and M.V.N.'s petition to adopt M.F. is against the weight of the evidence, the judgment of the trial court is reversed.

### Factual and Procedural Background

M.F. was born on February 21, 1996 in Kansas City, Missouri. Her biological mother, J.S. (Mother), who is Caucasian, and her biological father, R.A. (Father), who is African American, were not married to each other. Mother was married to another man at the time of M.F.'s birth, and her husband thereby became M.F.'s legal, but not biological, father. When M.F. was approximately one month old, Mother contacted an attorney regarding placing M.F. for adoption. The attorney then contacted Marie Cook, a social worker at Adoption Counseling, Inc. (formerly known as Associates in Adoption Counseling, Inc.). On March 29, 1996, M.F. was placed in foster care in Jackson County.

Ms. Cook showed Mother numerous profiles of potential adoptive parents for M.F. After meeting and talking to H.W.C. and M.V.N., a Caucasian couple who reside in Columbia, Missouri, Mother selected them to adopt M.F. H.W.C. is a psychologist employed by the Missouri Division of Youth Services, while M.V.N., also a psychologist, is employed by the Missouri Department of Corrections, Division of Offender Rehabilitative Services. H.W.C. and M.V.N. have a seven-year-old biracial son whom they adopted in 1992. Their son is Native American and African American.

On April 16, 1996, Mother and her husband, M.F.'s legal but not biological father, signed consents to M.F.'s adoption. In Mother's consent, she stated that she was consenting to the adoption of M.F. "by a couple who are approved and recommended by Associates in Adoption Counseling, Inc., and who are clients of Marilyn Shapiro." H.W.C. and M.V.N. were approved and recommended by Associates in Adoption Counseling, Inc. and were clients of Marilyn Shapiro at the time Mother signed her consent. On April 18 and 26, 1996, Family Court Commissioner Geoffrey Allen entered orders approving Mother's consent to the adoption, finding that she "specifically" consented to the adoption of M.F. by a couple who were approved by the adoption agency and who were clients of Marilyn Shapiro. On April 23, 1996, H.W.C. and M.V.N. filed a petition for transfer of custody and adoption of M.F. Commissioner Allen then appointed Ms. Cook "to conduct the investigation of all relevant parties to this adoption proceeding." Ms. Cook completed a home assessment of H.W.C. and M.V.N., and recommended them as adoptive parents for M.F. On May 1, 1996, Commissioner Allen entered an order transferring temporary custody of M.F. to H.W.C. and M.V.N.

Meanwhile, on April 23, 1996, Aunt, a medical malpractice defense attorney who resides in Potomac, Maryland, was notified by her sister-in-law that her youngest brother, Father, had fathered M.F. and that M.F. was being placed for adoption. Aunt called and left messages for Ms. Cook several times to inform her that she was interested in adopting M.F. Aunt also contacted Mother and spoke with her twice in an attempt to get more information about M.F. After several days had passed since Aunt had initially contacted her, Ms. Cook left a message on Aunt's answering machine. In her message, Ms. Cook stated that she did not have any child in her custody who was related to anyone in Aunt's family, but she would be happy to work with Aunt on placement of another child, upon receipt of a valid home study. Aunt then spoke to Ms. Cook twice on the phone. In those conversations, Aunt asked Ms. Cook how she knew that she did not have any child related to Aunt's family in her custody. Ms. Cook did not tell her, citing a concern for confidentiality. Aunt told Ms. Cook that she wanted to do what-

ever was necessary to adopt M.F., and that Ms. Cook needed to let those persons who were considering adopting M.F. know that she wanted to adopt her.

Prior to the May 1, 1996 transfer of custody hearing, Ms. Cook informed H.W.C. and M.V.N. that Aunt was inquiring about adopting M.F. or some other child. In the home assessment she prepared and submitted to the court during the transfer of custody hearing, however, Ms. Cook did not report that she had been contacted by Aunt regarding placement of M.F. with her.

Between May 4 and 5, 1996, Aunt contacted the Jackson County Circuit Court to get guidance on what she needed to do to file a petition for adoption. On May 15, 1996, Aunt sent a letter addressed to the Jackson County Courthouse Adoption Department stating that she was M.F.'s paternal aunt and was contesting M.F.'s pending adoption. She also stated that she and her fiancé, Roger Houston, were petitioning to adopt M.F. She sent a petition for adoption with her letter. Because it was missing a form, the petition was not filed with the court at that time. Aunt's letter was filed with the court, however.

After sending the letter and petitions to the Jackson County Circuit Court, Aunt had a third conversation with Ms. Cook. In this conversation, Ms. Cook told Aunt that she was 99% sure that Father was not M.F.'s father because Mother had told Ms. Cook he was not. Health care workers at a hospital who had treated M.F. had told Ms. Cook that M.F. was not a biracial child, as M.F. appears to be Caucasian. Aunt testified that Ms. Cook told her she would not recommend Aunt be allowed to adopt M.F. and that, without her recommendation, the court would not permit Aunt to adopt M.F.

Fourteen months later on July 30, 1997, Aunt filed a petition to adopt M.F. Aunt testified that a major reason why she did not take any formal action during this fourteen month period was that Ms. Cook had told her she was 99% sure that Father was not M.F.'s father. Thereafter, on September 25, 1997, Mother sent a letter to the trial court stating that she was withdrawing her consent to M.F.'s adoption. In the letter, Mother stated that she and Father did not believe that any of Father's family members, including Aunt, were appropriate placement options, and it was Mother's belief that M.F.'s placement with Aunt would create a "terrible conflict" within Aunt and Father's family. The court treated her letter as a motion to revoke her consent.

The trial court consolidated the two adoption petitions for trial and disposition. Family Court Commissioner John F. Payne heard evidence on the petitions for adoption on February 26 and 27, 1998. While the hearings were proceeding, Father took a blood test which determined he was the father of M.F. The results of the blood test were not known until March 12, 1998. On June 4 and 5, and August 20, 1998, Commissioner Payne heard evidence on Mother's motion to revoke her consent to the adoption. On August 20, 1998, Commissioner Payne also heard evidence from M.F.'s guardian ad litem on the petitions for adoption. Commissioner Payne entered "Findings and Recommendations" on August 21, 1998, in which he found that the rescission of Mother's consent would not be in M.F.'s best interests. The Honorable Jay A. Daugherty adopted Commissioner Payne's findings and recommendations and entered them as the court's judgment denying Mother's motion to revoke her consent.

On October 2, 1998, Commissioner Payne entered "Findings and Recommendations and Conclusions of Law" in which he found that Mother had consented to M.F.'s adoption and that Father's consent was not required because he had abandoned M.F. Commissioner Payne denied H.W.C. and M.V.N.'s petition to adopt M.F., and granted temporary custody of M.F. to Aunt, pending final adoption. On October 5, 1998, Judge Daugherty adopted

Commissioner Payne's findings and recommendations as the court's judgment on the petitions for adoption. H.W.C. and M.V.N. timely filed this appeal. This court granted H.W.C. and M.V.N.'s motion to stay execution of the trial court's judgment pending resolution of this appeal.

### Points on Appeal

H.W.C. and M.V.N. raise eight points on appeal. One of their points concerns the jurisdictional deficiencies of Aunt's petition; the other seven raise allegations of substantive error in the trial court's judgment denying their petition to adopt M.F. and granting Aunt temporary custody of M.F. This court will first address H.W.C. and M.V.N.'s point regarding the jurisdictional deficiencies in Aunt's petition. Because Aunt presumably would be allowed on remand to amend her petition to correct any jurisdictional defects, in the interest of judicial economy this court also will address H.W.C. and M.V.N.'s allegations of substantive error. Their dispositive allegation of substantive error is that the judgment denying their petition to adopt M.F. and granting Aunt temporary custody of M.F. is against the weight of the evidence.

### The Trial Court Lacked Jurisdiction Over Aunt's Petition For Adoption

■ H.W.C. and M.V.N. contend that the trial court erred in denying their motion to dismiss Aunt's petition for adoption and in granting Aunt temporary custody of M.F. because the court lacked subject matter jurisdiction over Aunt's petition.[1] Prior to the commencement of trial, H.W.C. and M.V.N. filed a motion to dismiss Aunt's petition in which they alleged that her petition was deficient in several respects, including that it failed to plead consent as required by § 453.030, RSMo 1994, or facts demonstrating that consent was not required pursuant to § 453.040, RSMo 1994. Commissioner Payne denied their motion, stating that he did not believe the deficiencies were fatal, and that all of the procedural deficiencies were resolved by the court's consolidation for trial and disposition of the two petitions for adoption. Later during the trial, when H.W.C. and M.V.N. attempted to introduce evidence that Mother's consent was a consent to M.F.'s adoption by them and not by Aunt, Commissioner Payne repeatedly stated that Aunt's failure to produce Mother's consent or reasons obviating the need for consent was a "non-issue," and that the issue would "really become alive and well" only when and if he decided to place M.F. with Aunt.

■ Whether Aunt's petition was sufficient to confer subject matter jurisdiction to the trial court is a matter of statutory law, as proceedings for adoption in Missouri are governed by statute. *Adoption of R.A.B. v. R.A.B.,* 562 S.W.2d 356, 357 (Mo. banc 1978). Section 453.030.3, RSMo 1994, the statute in effect at the time Aunt filed her petition, provided in part that "the written consent of the parents ... to the adoption shall be required and filed in and made a part of the files and record of the proceeding." Section 453.040, RSMo 1994, provided that the consent to the adoption of a child is not required of:

(1) A parent whose rights with reference to the child have been terminated pursuant to law;

(2) A parent of a child who has waived the necessity of his or her consent to a future adoption of the child;

---

1. Generally, no appeal lies from temporary custody orders in adoption proceedings and appeal lies only from the judgment of adoption. *J__ E__ S__ v. D__ L__ S__,* 921 S.W.2d 636, 638 (Mo.App.1996). However, where two competing petitions for adoption are adjudicated in one proceeding, the grant of the temporary custody order to one of the petitioners effectively disposes of both adoption petitions. *In re Adoption of J__ G__ L__, Jr.,* 853 S.W.2d 433, 436 (Mo.App.1993). Thus, the temporary custody order in this case is an appealable order. *Id.*

(3) A parent whose identity is unknown and cannot be ascertained;

(4) A parent who has a mental condition which is shown by competent evidence either to be permanent or such that there is no reasonable likelihood that the condition can be reversed and which renders the parent unable to knowingly provide the child the necessary care, custody and control;

(5) A parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection.

 The consent of the biological parents to the adoption, or the facts which make their consent unnecessary, are jurisdictional. *In re Adoption of K.A.S.*, 933 S.W.2d 942, 946 (Mo.App.1996). The court cannot reach issues regarding the fitness of the petitioners and the welfare of the child unless the court has jurisdiction. *R.A.B.*, 562 S.W.2d at 357. The petitioners "must plead and prove the exception to the requirement of consent of the natural parents." *K.A.S.*, 933 S.W.2d at 946.

Aunt's petition contained no reference Mother's consent or the reasons why Mother's consent was not required. In H.W.C. and M.V.N.'s petition for transfer of custody and adoption of M.F., they alleged that Mother consented to the adoption of M.F. In her consent to M.F.'s adoption, Mother stated, "I freely and voluntarily consent to the adoption of my child, [M.F.], by a couple who are approved and recommended by Associates in

Adoption Counseling, Inc., and who are clients of Marilyn Shapiro...." At the time Mother executed her consent, she had met with and selected H.W.C. and M.V.N., who were approved and recommended by Associates in Adoption Counseling, Inc., and who were clients of Marilyn Shapiro. Aunt was not, and there was evidence at trial that Mother specifically did not want Aunt to adopt M.F. In the April 26, 1996 order approving Mother's consent, Commissioner Allen found that Mother "did therein specifically consent to the adoption of her minor child, [M.F.], by a couple who are approved and recommended by Associates in Adoption Counseling, Inc., and who are clients of Marilyn Shapiro." At the hearing on Mother's motion to revoke her consent, Commissioner Payne asked Mother if it was her "specific and unequivocal intent" to name H.W.C. and M.V.N. as the individuals to whom she wanted to give consent, "as opposed to the rest of the world." Mother answered in the affirmative.

Mother's consent to M.F.'s adoption by a specific couple did not constitute a consent to adoption by Aunt or anyone in general. *See State ex rel. L.L.B. v. Eiffert*, 775 S.W.2d 216, 220 (Mo.App.1989) (finding that a mother's consent to an adoption by the maternal grandfather and step-grandmother "was limited to an adoption by the adoptive parents named in that consent."). Nor did it constitute a waiver of her consent to a future adoption which would obviate the need for Mother's consent to M.F.'s adoption by Aunt under § 453.040(2), RSMo 1994.[2]

*See In re Mayernik*, 292 S.W.2d 562, 568 (Mo.1956) (differentiating between a parent's consent to an adoption by specific persons and a parent's waiver of the necessity of consent to a future adoption).

---

**2.** Section 453.040(2) was amended in 1998 to read that the consent to adoption is not required of "A parent of a child who has legally consented to a future adoption of the child." As this amendment occurred after the trial in this case, it does not apply and this court expresses no opinion as to whether the change would affect this court's holding on this issue.

As Aunt did not plead or prove Mother's consent or any of the circumstances in § 453.040, RSMo 1994, in which Mother's consent would not be required, the court was without jurisdiction to proceed on Aunt's petition for adoption. *K.A.S.*, 933 S.W.2d at 946. Subject matter jurisdiction over Aunt's petition for adoption was a relevant and "alive" issue at the outset of the hearing. Without jurisdiction, the trial court had no authority to reach the issue of Aunt's fitness as an adoptive parent for M.F., nor did the court have any authority to determine whether M.F.'s placement with Aunt would be in M.F.'s best interests. *R.A.B.*, 562 S.W.2d at 357. Therefore, the trial court erred in failing to dismiss Aunt's petition for adoption. Because this holding is dispositive of the point, this court does not need to address the other deficiencies in Aunt's petition alleged by H.W.C. and M.V.N.

### The Denial of H.W.C. and M.V.N.'s Adoption Petition is Against the Weight of the Evidence

 In two of their points on appeal, H.W.C. and M.V.N. contend that the trial court abused its discretion in granting Aunt temporary custody of M.F. and denying their petition to adopt M.F. because its decision is against the weight of the evidence. H.W.C. and M.V.N. contend that the trial court failed to consider certain factors and gave inappropriate weight to others. In reviewing the trial court's judgment denying an adoption petition, this court will affirm the judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Matter of B.S.R.*, 965 S.W.2d 444, 448 (Mo.App.1998). Generally, an appellate court will reverse only if it finds that the trial court abused its discretion, and "[j]udicial discretion is abused when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Waisblum*

*v. Waisblum*, 968 S.W.2d 753, 755 (Mo. App.1998). This court defers to the trial court's credibility determinations and accepts as true the evidence and inferences favorable to the judgment. *G.S.M. v. T.H.B.*, 786 S.W.2d 898, 900 (Mo.App. 1990). In a matter involving the custody of a child, greater deference is generally afforded to the trial court's finding regarding the best interests of the child; however, the trial court's decision is still subject to appellate review. *Id.* at 903. If this court finds that the trial court's judgment is against the weight of the evidence, this court can and will reverse the judgment. *See id.*

 The adoption statutes are to be construed "so as to promote the best interests and welfare of the child in recognition of the entitlement of the child to a permanent and stable home." Section 453.005.1, RSMo Cum.Supp.1998. Indeed, the paramount consideration in an adoption proceeding is the best interests of the child. *In Interest of L.W.F.*, 818 S.W.2d 727, 734 (Mo.App.1991); *G.S.M.*, 786 S.W.2d at 903. A best interests determination involves the consideration of a myriad of factors, and no single factor is outcome-determinative. As one court stated:

> The factors to be considered in determining what is in the best interests of the child are legion. They vary from case to case. It is impossible to catalogue all the factors that may be involved. It is virtually impossible to assign a degree of weight to specific favorable and unfavorable factors. With the exception of an extreme adverse factor, no single factor can be absolute. Each case must be considered upon its own facts.

*L.W.F.*, 818 S.W.2d at 734 (citations omitted). Some of the factors to be considered by the court in determining the child's best interests are whether the adoptive parents will provide the child with good care and a stable home. *In re Adoption of T.E.B.R.*, 664 S.W.2d 609, 613 (Mo.App.1984). The

ability of petitioners to meet the needs of a child with a specific cultural, racial and ethnic background is also a proper consideration in determining the child's best interests. Section 453.005.3, RSMo Cum. Supp.1998. Additionally, the degree of bonding between the custodial parents and the child is a significant factor in determining whether finalization of the adoption is in the child's best interests. *T.E.B.R.*, 664 S.W.2d at 613.

## A. The Level of Care the Petitioners Could Provide M.F.

■ Applying these factors to this case, the evidence showed that both Aunt and H.W.C. and M.V.N. would provide good care to M.F. Aunt, an attorney, resides in Potomac, Maryland. She has a twenty-year old son from a previous marriage. She moved to the neighborhood in which she resides because the school district had the best programs for her son, who is learning disabled. Aunt has spent a lot of time working with her son to help him cope with his learning disabilities. At the time of the trial, her son was attending junior college and did not live at home. In the summer of 1996, Aunt's thirteen-year old niece stayed with Aunt, and Aunt found her a job, arranged for her aftercare, and spent a significant amount of time with her. Aunt has contributed a lot of her time to volunteering at a children's hospital, and is an active member of her church.

By the same token, the evidence showed that H.W.C. and M.V.N. have provided good care to M.F. M.F. has lived continuously with H.W.C., M.V.N. and their son in Columbia since the entry of the May 1, 1996 temporary custody order. Even prior to the temporary custody order, H.W.C. and M.V.N. visited weekly with M.F., and stayed with her in the hospital when she was hospitalized for five days with an infection in her kidneys. H.W.C. and M.V.N. ensure that M.F. receives immunizations and appropriate medical care. H.W.C. and M.V.N., both psychologists, work during the day, while M.F. and their son attend Columbia Montessori School. Both H.W.C. and M.V.N. take time off of work to participate in their son and M.F.'s school activities and volunteer at the school. Additionally, H.W.C. and M.V.N. take M.F. and their son to educational programs sponsored by the public library, and they have a Parents as Teachers consultant for M.F. The undisputed evidence at trial was that M.F. is presently a bright, happy, healthy and well-adjusted child. In looking at which adoptive placement could provide M.F. with good care, the evidence weighs equally in favor of Aunt and H.W.C. and M.V.N.

## B. The Stability of the Petitioners' Homes

■ In addition to considering the level of care potential adoptive parents can provide the child, courts also consider the stability of the potential adoptive home. Section 453.005.1, RSMo Cum.Supp.1998; *T.E.B.R.*, 664 S.W.2d at 613. On this issue, the evidence at trial was that H.W.C. and M.V.N. have been married for ten years, and have a strong, stable and loving marital relationship. The evidence indicates that they have lived in Columbia for most, if not all, of their marriage. H.W.C. and M.V.N. adopted their seven-year-old son in 1992, and have provided a secure and stable home for him and M.F.

Aunt is a single mother who has been divorced from her child's father since 1989. The evidence indicates that she provided a secure and comfortable home for her son. Her son, who is now twenty years old, no longer lives at home, as he is attending college. Aunt is engaged to Roger Houston, a man she has been dating since 1990. They plan to be married, and Aunt testified that she anticipates Mr. Houston will be an important and integral part of M.F.'s life, should her petition be granted. Aunt also testified, however, that Mr. Houston is married to another woman, and has been for the duration of their relationship. Although they do not presently live together,

Aunt and Mr. Houston lived together from 1990 until 1996. In her May 15, 1996 letter to the court in which she expressed her desire to adopt M.F., she told the court that both she and Mr. Houston were petitioning to adopt M.F. because they planned to be married on October 30, 1996. They did not get married, nor did Mr. Houston join in Aunt's July 30, 1997 petition to adopt M.F. In fact, as of the trial date, although a divorce proceeding was pending, Mr. Houston continued to be separated but not divorced from his wife.

The uncertainty of the absence or presence of Mr. Houston in Aunt's home is an unstable element in what otherwise appears to be a stable home environment. Because of this unstable element, however, the weight of the evidence on the issue of who can provide M.F. with a more stable home favors H.W.C. and M.V.N.

## C. The Ability of the Petitioners to Meet M.F.'s Needs With Regard to Her Cultural, Racial and Ethnic Background

■ Another factor to consider in determining which adoptive placement would serve M.F.'s best interests is the petitioners' ability to meet M.F.'s needs with regard to her cultural, racial and ethnic background. Section 453.005.2, RSMo Cum.Supp.1998, requires that all persons involved in adoptive placements "provide for the diligent recruitment of potential adoptive homes that reflect the ethnic and racial diversity of children in the state for whom adoptive homes are needed." M.F.'s biological mother is Caucasian and her biological father is African American; therefore, M.F. is a biracial child. Neither H.W.C. and M.V.N., who are Caucasians, or Aunt, who is African American, "match" M.F.'s biracial ethnicity. The statute, however, does not require that the adoptive parents and the adoptive child be of the same racial or ethnic composition. Section 453.005.2, RSMo Cum.Supp.1998, requires only "the diligent recruitment of potential adoptive homes that *reflect* the

ethnic and racial diversity" of adoptive children. (Emphasis added).

In addition to requiring diligence in recruiting adoptive homes that reflect the ethnic and racial diversity of adoptive children, the statute also requires that the court consider, as one of the many factors used in a best interests analysis, "a child's cultural, racial and ethnic background and the capacity of the adoptive parents to meet the needs of a child of a specific background...." Section 453.005.3, RSMo Cum.Supp.1998. The statute cautions that this factor is to be applied on an individualized, rather than general, basis, and the "[p]lacement of a child in an adoptive home may not be delayed or denied solely on the basis of race, color or national origin." Section 453.005.3—.4, RSMo Cum.Supp.1998.

On this issue, Aunt's mother testified that Aunt's extended family includes persons of different ethnic and racial backgrounds, including Faroese, Indian, African American and Irish, and several members of the family are multiracial. In Aunt's testimony as to why placement with her would be in M.F.'s best interests, Aunt offered the following testimony regarding her ability to meet M.F.'s needs in light of M.F.'s ethnic and racial background:

> I am within her own minority racial classification. And I understand what she's going to be faced with growing up. I know that intrinsically, it's just instinctive. I don't have to go out and learn, and try to put that on as a layer on top of me. That comes from the inside.

With regard to H.W.C. and M.V.N.'s ability to meet M.F.'s needs arising from her ethnic and racial background, Aunt argues that there was affirmative evidence that H.W.C. and M.V.N. have and would continue to deny M.F. her racial and ethnic background. H.W.C. acknowledged at trial that he had made the following statement in part of his response to an interrogatory asking him to describe why they would be better parents than Aunt:

[M.F.] looks like us and is recognized by outsiders, to be our biological child. She appears to be caucasian and will be identified throughout life as a caucasian. It is in her best interest to be with parents who look like her as opposed to [Aunt]'s situation, in which she would be identified as "the white child with the Black Mother" and would have constant attention called to her throughout her life.

H.W.C. also acknowledged that he had testified in his deposition that he and M.V.N. did not have any plans to find out definitively what M.F.'s race was, because they did not know of any way to find out that information.

In addition to H.W.C.'s statements, however, there was also an abundance of evidence that H.W.C. and M.V.N. are raising M.F. in a multicultural environment and have made efforts to expose her to diverse ethnic and cultural influences and educate her about her African American heritage. H.W.C. and M.V.N. have a multiracial family. H.W.C. and M.V.N.'s adopted son is African American and Native American. Their son, as a biracial child, will likely encounter many of the same experiences, and perhaps questions, as will M.F., and each child can provide support for the other.

The evidence indicates that H.W.C. and M.V.N. have provided an environment that attends to the ethnic and racial backgrounds of both their son and M.F. Although H.W.C. and M.V.N. work in Fulton, they choose to live in Columbia, a community whose racial diversity and multiculturalism is influenced by the presence of the University of Missouri. The daycare M.F. and their son attend, Columbia Montessori School, has minority staff members and a 25–30% minority student population, which includes children who are African American, Native American, Hispanic, Asian, Indian, and Korean. H.W.C. and M.V.N. have African American friends who spend time with their son and M.F., and some of the children's babysit-

ters have been African American college students. H.W.C., M.V.N., their son, and M.F. have attended story hours and programs on multicultural issues at the public library. H.W.C. and M.V.N. have taken M.F. and their son to Kwanzaa and Martin Luther King Day celebrations. The director of M.F.'s daycare and Kris Probasco, a licensed clinical social worker who interviewed H.W.C. and M.V.N. in their home, both testified that H.W.C. and M.V.N. have artwork, pictures, books, toys and music in their home that reflect different races and cultures, including African American and Native American. H.W.C. and M.V.N. have attended meetings of the Committee to End Racism. Additionally, H.W.C. is a member of the Association of Multicultural Counseling, and as part of her work, M.V.N. evaluates cultural diversity training packages. Comparing Aunt's personal experiences as a minority and her multiracial extended family to H.W.C. and M.V.N.'s family, which includes a biracial child who will likely share the same experiences as M.F., and the efforts that H.W.C. and M.V.N. have already made which demonstrate their ability to attend to the ethnic and racial backgrounds of their son and M.F., this factor weighs equally in favor of Aunt and H.W.C. and M.V.N.

## D. The Biological Link Between Aunt and M.F. vs. the Familial Bond Between H.W.C, M.V.N., Their Son, and M.F.

 The factor the trial court considered "critical" in denying H.W.C. and M.V.N.'s petition to adopt M.F. and in giving Aunt temporary custody of M.F. was Aunt's biological link to M.F. In support of its finding that this biological link is a critical factor in this case, the court cited *M.L.S. v.C.S.*, 710 S.W.2d 452 (Mo. App.1986), and *In re G*, 389 S.W.2d 63 (Mo.App.1965). One of the issues before the court in *M.L.S.* was whether the termination of a natural mother's parental rights was in the child's best interests. 710 S.W.2d at 454. The court stated, in

*dicta,* that a "relevant factor" in this determination is the separation of siblings. *Id.* In *In re G,* the issue before the court was whether to place a child with his natural mother or to allow his paternal grandmother to adopt him. 389 S.W.2d at 69. In denying the grandmother's adoption petition, the court stated, "We think that it is desirable that a child, where there are brothers and sisters, be reared in the give-and-take atmosphere of the family, rather than be separated from them and reared as an only child. All things being equal, it is better that families be kept together." *Id.*

◼ Clearly, a biological relationship between a child and an adoptive parent is a significant factor for the court to consider in determining whether the placement is in the child's best interests. However, this factor is not decisive, and there can also be negative aspects of placing a child with a biological relative. In *Matter of M.D.H.,* 595 S.W.2d 448, 449 (Mo.App. 1980), the paternal grandparents and foster parents filed competing petitions to adopt a minor child who had lived with the foster parents since she was 40 days old. After the trial court granted the foster parents' petition, the grandparents appealed. *Id.* On appeal, the court stated that "[t]he blood relationship relied upon by the [grandparents] to tip the scales in their favor is but one factor, which does not necessarily preponderate in their favor." *Id.* at 451. The court found that under the circumstances, there were drawbacks to the relative placement. *Id.* More persuasive to the court in determining the child's best interests was "the period of three years and five months during which the child lived in the home of and was cared for by [foster parents]." *Id.* Citing the "strong bond of attachment and affection" between the child and the foster parents, and the emotional trauma to the child of disrupting the relationship, the court considered the period of custodial care to be "of crucial importance" and "of overriding significance." *Id.*

In this case, Aunt testified that she believes granting her petition for adoption would be in M.F.'s best interests because she is part of M.F.'s family and does not want M.F. to be stripped of her family. Aunt testified that she is very close to her extended family, and anticipates her uncle, her father, and two of her brothers would all be integrally involved in M.F.'s life. Every two years, Aunt's family has a reunion where 150 to 175 members of the family gather. Aunt's parents, another one of her brothers besides M.F.'s father, and cousins live in Kansas City, and Aunt visits them approximately three to four times a year.

Aunt is not close, however, to her brother, who is M.F.'s father. Aunt has not seen Father since Thanksgiving of 1993. Father has been estranged from his family for the past eight to ten years, and his family usually does not know where he is living or how to get in touch with him. According to Aunt, Father expresses strange negative thoughts and is not mentally stable.

There was evidence at trial that Father is opposed to Aunt's adopting M.F. In Mother's letter to Commissioner Payne which he treated as a motion to revoke her consent to the adoption, Mother stated that if she and Father had felt that any of his family members were appropriate for M.F., they would have given M.F. to them. According to Mother, neither she nor Father believe Aunt is "the appropriate placement option," and they believe that Aunt's motives are "very twisted." Mother contends that M.F.'s placement with Aunt would "create terrible conflict" within Aunt and Father's family.

The evidence showed that M.F. is Aunt's biological niece, and that Aunt is close to all of her family members except M.F.'s father, and intends to keep M.F. close to her biological family. The significance of Aunt's biological relationship to M.F. is diminished somewhat by the evidence that M.F.'s father is estranged from the rest of

the family, including Aunt, and is opposed to Aunt's adopting M.F.

Moreover, when considering the biological link between M.F. and Aunt as a part of M.F.'s best interests determination, this court must also consider the period of time during which M.F. has been in the care and custody of H.W.C. and M.V.N., and the effects of removing her from them. *In Interest of J.L.H.*, 647 S.W.2d 852, 859 (Mo.App.1983); *M.D.H.*, 595 S.W.2d at 451. As this court has previously stated, the degree of bonding between the custodial parents and the child is a significant factor in determining whether finalization of the adoption is in the child's best interests. *T.E.B.R.*, 664 S.W.2d at 613. Indeed, the child's emotional well-being after the expiration of the temporary custody period is clearly an important consideration in adoptive placements. Section 453.077.1, RSMo Cum.Supp.1998, requires that post-placement assessments, which are prepared after the expiration of the temporary custody period and are submitted to the court prior to the finalization of the adoption, include a report on the child's emotional status.

M.F. has lived continuously with H.W.C. and M.V.N. since the entry of the May 1, 1996 custody order, when she was two and one-half months old. H.W.C. and M.V.N. spent time with her prior to the entry of that order as well. Although the trial court would not allow testimony from the social workers involved in the case regarding results of their clinical assessments of M.F.'s bonding and attachment to H.W.C. and M.V.N. and the effects of disrupting this bonding, there was an abundance of evidence that M.F. has a close and loving familial bond with H.W.C., M.V.N., their son, and their extended family.

Aunt argues that M.F. was placed in H.W.C. and M.V.N.'s care and custody, which precluded Aunt from having an opportunity to bond with M.F., as a result of the misrepresentations of Ms. Cook to the court and to Aunt. It is true that Ms. Cook misinformed Aunt that it was unlikely that M.F. was related to Aunt, and she did not report to the court Aunt's desire to adopt M.F. prior to the entry of the order placing temporary custody of M.F. with H.W.C. and M.V.N. Nevertheless, the court was advised by Aunt's letter of her existence and her desire to adopt M.F. two weeks after the temporary custody order was entered. In addition, Aunt, a medical malpractice defense attorney, allowed fourteen months to pass before she filed her petition to adopt M.F. In doing so, Aunt's conduct contributed to M.F. being left in H.W.C. and M.V.N.'s custody during a time that the bonding originally occurred.

There is no indication that H.W.C. and M.V.N. did anything to contribute to Aunt's fourteen-month delay. Ms. Cook may have misled the court for the two-week period between the time she was first contacted by Aunt and May 15, 1996, when the court received Aunt's letter notifying it of her existence and interest in adopting M.F. Ms. Cook may have also misled Aunt initially regarding the likelihood of M.F.'s relationship to Aunt, but Ms. Cook's conduct cannot excuse Aunt's failure to diligently pursue her interest in adopting M.F. by filing an adoption petition. Aunt's inaction significantly contributed to M.F. being left in H.W.C. and M.V.N.'s home for a longer period of time. Thus, through no fault of H.W.C. and M.V.N., and certainly through no fault of M.F., M.F. had fourteen more months to bond and develop a familial relationship with H.W.C., M.V.N. and their son. The reality of the situation is that by the commencement of the trial, M.F. had spent all but the first two and one-half months of her two years of life in the sole care and custody of H.W.C. and M.V.N. Aunt and M.F. share a biological relationship; however, in determining which adoptive placement would be in M.F.'s best interests, this biological link, which is diminished somewhat by the fact that Father is estranged from Aunt and the rest of the family and is opposed to Aunt's adopting M.F., is outweighed by the familial bond

that has developed between M.F., H.W.C., M.V.N. and their son.

In weighing the enumerated factors, it weighs in Aunt's favor that she is biologically related to M.F., could provide good care to M.F., and would be able to share her minority experience. This, however, does not end the inquiry. The legislature requires that the adoption provisions be construed "so as to promote the best interests and welfare of the child in recognition of the entitlement of the child to a permanent and stable home." Section 453.005.1, RSMo Cum.Supp.1998. The weight of the evidence indicates that M.F. has had a good and stable home with H.W.C. and M.V.N. since she was two and one-half months old, H.W.C. and M.V.N. have the capacity to meet M.F.'s needs with respect to her biracial ethnicity, and, most importantly, over the almost two years that she was in their custody prior to trial, M.F. bonded with H.W.C., M.V.N., and their son as a member of their family. *J.L.H.*, 647 S.W.2d at 859. To disrupt that relationship now would unquestionably be contrary to M.F.'s best interests. In reaching its decision, the trial court totally disregarded the importance of the bonding which has occurred between M.F. and H.W.C. and M.V.N. The trial court's judgment finding that M.F.'s best interests would be served by removing her from H.W.C. and M.V.N.'s care and custody is against the weight of the evidence. This court finds that the trial court's order denying H.W.C. and M.V.N.'s petition to adopt M.F. and granting Aunt temporary custody of M.F. constitutes an abuse of discretion and should be reversed. As this holding is dispositive, this court does not need to address the other allegations of substantive error raised by H.W.C. and M.V.N.

### Conclusion

The trial court erred in denying H.W.C. and M.V.N.'s motion to dismiss Aunt's petition. Because Aunt neither pleaded nor proved Mother's consent to M.F.'s adoption or the circumstances under which Mother's consent was not required, the trial court lacked subject matter jurisdiction over Aunt's petition for adoption. Moreover, even if Aunt were allowed to amend her petition to correct the jurisdictional deficiencies, the court's judgment denying H.W.C. and M.V.N.'s petition to adopt M.F. and placing her in Aunt's temporary custody is against the overwhelming weight of the evidence. Therefore, the judgment of the trial court is reversed, and the trial court is directed to enter a judgment granting H.W.C. and M.V.N.'s petition to adopt M.F.

All concur.