In re Interest of G————.

In re ADOPTION OF G————.

Nos. 8360, 8379.

Springfield Court of Appeals.

Missouri.

March 24, 1965.

Henry Warten, Joplin, for appellant.

George C. Baldridge, Joplin, for respondent.

RUARK, Presiding Judge.

This is a contest between the mother and the paternal grandmother concerning the custody and adoption of male child G———, who it appears was six years of age at the time the proceedings were commenced. The child is one of four children. The mother with three of the children lived at A———, Kansas, a small town about fifty miles from Joplin, Missouri. The grandmother had actual or physical custody of G—— and lived in Joplin. On April 9, 1963, the mother wrote the grandmother and informed her that she was coming over to Joplin to get her child and to please have his clothes ready. The grandmother went to the Juvenile officer in Jasper County and such Juvenile officer, on *April 11, 1963,* instituted what was designated as Case No. 5050 by filing a petition in Juvenile Court. This petition asserted that the mother resided in A—— and the father "resided" in Jefferson City. It stated that the child is "now in the custody of ———————" (no name); that the child was *abandoned* by both mother and father in 1957, and that both parents signed *relinquishment* for the grandmother to adopt

in 1957. On the same day (April 11, 1963), apparently without investigation, home study report, notice or hearing, an order was made making the child a temporary ward of the court and placing care and custody in the grandmother pending hearing. Both mother and grandmother employed attorneys, and arrangement was worked out by the attorneys whereby the child could visit his mother and sisters and brother pending hearing. On September 19, 1963, the mother filed a motion requesting the Juvenile Court to set aside its order of April 11 and to order custody in her, the natural mother. In support of such motion she alleged that when the child G—— was born she and the father lived in Kansas City; that she, the mother, was compelled to work at the father's insistence and by necessities of the family; that when G—— was a newborn infant the grandmother and the father presented to the mother a printed form, already signed by the father; and, in response to the urgings and insistence of the father and grandmother, the mother signed it; that when it was signed the grandmother assured the mother she would return the child whenever the father ceased his wanderings, reformed, and secured gainful employment; that thereafter the mother sought to have the infant reunited with the family but was prevented by the father and grandmother; that finally the mother separated from the father; that thereafter the father was convicted of the crime of burglary and was at the time of filing of the petition in the penitentiary; that shortly thereafter the mother came to Joplin to get her son G—— so as to reunite him with the family but was prevented by the proceedings instigated by the paternal grandmother; that the petitioner mother had at all times opposed the adoption of her son by the grandmother; that the consent to adopt purportedly given by the written instrument was not willingly or understandably given and she repudiated the same.

On November 15, 1963, the paternal grandmother instituted what was docketed as Case No. 6279 by filing a petition for adoption of her grandson. The petition stated that the father and mother consented in writing to such adoption and that they abandoned the child when he was four days old. Accompanying such petition was a printed form of consent to adoption. None of the blanks in the printed form are filled in, but it is purportedly signed by the father and mother and acknowledged before a notary public. We will refer to this more fully hereafter. The mother filed answer contesting the adoption. On February 18, 1964, the two cases were consolidated and hearing was commenced. On April 22, 1964, after hearings, the court sustained the petition of the grandmother and decreed the adoption in Case No. 6279. On the same day the mother's petition for custody in Case No. 5050 was denied. The mother has appealed.

We first address ourselves to contentions of the appellant as to matters of record: One complaint is that the order placing custody in the paternal grandmother and the decree of adoption unto her were entered without investigation and report, since (it is contended) the decree of adoption was entered on April 22, 1964, whereas the written Home Study report filed by the Juvenile officer is dated April 24, 1964, and was not filed until April 28, 1964. As to this:

■ Adoption statutes are to be strictly construed against the deprivation of natural parents in regard to the parent and child relationship.[1] Section 453.070, V.A.M.S. provides that *no decree of adoption shall be entered, nor shall · transfer of custody to the petitioner be ordered* until a full investigation has been made and that the results of the investigation shall be embodied in a *written* report which shall be submitted to the court.

1. In the Mayernik, Mo., 292 S.W.2d 562 (3); In re Slaughter, Mo.App., 290 S.W. 2d 408, 411; In re Adoption of J. M. K., Mo.App., 363 S.W.2d 67(6).

The requirement of such statute in respect to investigation and report is mandatory. See Sherrill v. Bigler, Mo. App., 276 S.W.2d 473. The object and purpose of such investigation and report is the protection of the child and the public by apprising the court of the circumstances prior to order or decree. A report presented after the decree of adoption has been entered obviously comes too late.

Other of appellant's complaints deal with the appointment of guardian ad litem. It is contended that (a) whereas the principal hearing and presentation of evidence was on February 18, 1964 (and apparently some further hearing was held on February 27, 1964), the record shows that the guardian ad litem was appointed on April 22, 1964, the day adoption was decreed; and (b) the guardian ad litem so appointed was the attorney who had actively represented the petitioner grandmother throughout the proceedings.

Section 453.020, V.A.M.S. (Amended Laws of 1959, RSMo 1959, p. 3957) provides that the court should, in all cases where the person sought to be adopted is under the age of twenty-one years, appoint a guardian ad litem. See State v. Schilb, Mo.App., 285 S.W. 748(4). Such guardian ad litem should be appointed in time to permit proper representation of the minor's interests. The general rule is that he should be appointed as soon as the minority becomes apparent.[2] In an adoption case the minority should be apparent at the outset.

The appointment and service of a guardian ad litem is not a mere technical formality. The person so appointed is not a mere "figurehead." It is his duty to protect the interests of the child. He should not waive or give up anything which affects the interest of his ward.[3] In this case the decree recites that the court was well and fully advised in the premises and that "the guardian ad litem now appointed by the court recommends this adoption be made."

In an adoption proceeding both the child and the state are interested parties. 2 C.J.S. Adoption of Children § 36, Note 59 PP.; see State ex rel. Earnest v. Meriwether, Mo., 270 S.W.2d 20, 22. And it is obvious that the appointment of an attorney representing a party who seeks to terminate the child's physical and legal relationship with the parents is improper. The person so appointed should be in a position to represent the best interests of the child and to fairly advise the court. If he has an axe to grind in that he is employed to represent the petitioner for adoption, he should not be appointed. See Sargeant v. Rowsey, 89 Mo. 617, 1 S.W. 823, 824.

It is difficult, from this voluminous and rather confusing record, to ferret out and determine what and when things were done. The matters of the investigation and report, and of appointment of guardian ad litem, if found to be in accordance with appellant's contentions, would call for reversal of the court's judgments but would not necessarily terminate this legal tug-of-war between the mother and the paternal grandmother. It is for the best interest of the child that all questions be finally settled; therefore, we consider and rule upon the appellant's principal contention that all the evidence shows that the child-parent relationship should not be terminated by adoption to the grandmother, and that the best interests of the child require that he be placed in the custody of his mother. This necessitates a more complete examination of the facts.

Appellant mother, who is a junior college graduate, and the child's father were mar-

---

2. Morgan v. Morgan, Mo.App., 289 S.W. 2d 151, 152; Weiler v. Weiler, Mo.App., 331 S.W.2d 165, 167; State ex rel. and to Use of Marlowe v. Nolan, Mo., 146 S.W. 2d 598, 601.

3. Tracy v. Martin, 363 Mo. 108, 249 S.W. 2d 321; M. F. A. Mutual Ins. Co. v. Alexander, Mo.App., 361 S.W.2d 171, 181; Kennard v. Wiggins, 349 Mo. 283, 160 S.W.2d 706, cert. den. 317 U.S. 652, 63 S.Ct. 47, 87 L.Ed. 524.

ried (March 1954) in Nebraska, where their first child was born. Within the next three and one-half years they had moved to Joplin, Missouri, then to Berkeley, California, where a second child was born, then to Napa, California, back to Joplin again, and then to Kansas City, where the infant G—— was born on November 13, 1957. After that they moved to Galena, Kansas (which is adjacent to Joplin), and there they lived when the fourth child was born. The family lived a rather pillar-to-post existence. This, it is evident, was due greatly to the irresponsibility and the inability, or lack of inclination, on the part of the father to hold a job. He had a "drinking problem." He had frequent "brushes with the law." There is mention of repeated lost jobs, of leaving one place of residence because of a "check." There were frequent occasions during which the father would be gone from home for varying periods of time. The mother was required to work, even during pregnancies, in order to provide a living for the family. Finally, while they lived in Galena, there was a permanent separation, and after the mother was laid off work at the garment factory, she, with the three children then in her custody, moved to A——, which is in the vicinity of where her parents live. Her parents are farmers of excellent repute. They help the mother and her family by supplying meat, farm produce, and "gifts." In October 1961, she was admitted to the rolls of Aid to Dependent Children and now receives one hundred sixty-five dollars per month, plus medical service. The case worker for ADC in her locality testified that in the event she secures custody of G—— she will receive an additional $30.35 on his account. She has now obtained a Kansas decree of divorce from her husband and was awarded care and custody of her children. She lives in a large rented house but because of difficulty in heating uses only four rooms and bath in cold weather. The two oldest children with her attend school in A——, and she stays home with the youngest (not yet of school age). She attends P.T.A., and she and the children attend church and

Sunday school. A large number of witnesses—it would seem the women of A—— almost en masse—give her a good reputation as to character, as to good housekeeping, and as to the way she keeps her home, and care and supervision of her children.

The paternal grandmother was at time of trial fifty years old. She is separated from her second husband (who is not the grandfather of G——), but there is no indication or intimation that her separation from either of her husbands was due to any fault of hers; and she bears a good reputation in the community where she lives. She is a good housekeeper; she obviously cares for her grandson and looks after him to the best of her ability. She is employed as a nurses' aid at a local hospital, for which employment she receives one hundred sixty dollars per month. She works six days per week (her day off is irregular), and her working hours are from 2:30 to 11 P.M. Since she received physical custody of G——, she has moved her place of residence six times, but all of these places were in Jasper County. She is now, however, buying her present residence and is paying forty dollars per month on the purchase price. She also pays taxes of approximately twenty-three dollars per year. The residence consists of a living room, kitchen, bedroom, and bath.

The evidence indicates that she has retained a mother's interest in her son (the father of G——) and his problems, and there has been some visiting with him and presumably with her grandchildren. On one occasion she went to Kansas City to talk to him about a job opening for him at Neosho. After the separation of the mother and the father, the father lived with *his* mother, the petitioner, and had been so living there when he got involved in a burglary for which he was later sentenced. After the father was arrested, but not sentenced, the petitioner grandmother, went to A—— to see the mother. She says she went there to solicit the mother to take the children with her to see the father, who was then confined. The testimony of the

mother, however, is to the effect that the grandmother's purpose in that visit was to secure an alibi for the father. After the father was sentenced and this proceeding was started, the grandmother went to Medium Security Prison, where her son was then confined, in order to consult with him about it.

Now as to how the grandmother petitioner got physical custody of G——: The mother had been working; apparently the father was not working, at least not regularly. When she came from the hospital with the baby on the fourth day, the grandmother had come to Kansas City to take the child back to Joplin with her. The parties differ as to the understanding. The mother says the grandmother took the child because she, the mother, was not able to return to work immediately after confinement; but that she didn't know the grandmother intended to take the child until she got home from the hospital with the baby and her husband announced he couldn't support the child. Within two weeks the grandmother was back with a paper to have signed. The mother testified, "Well, I signed it because my husband didn't want the child and he said he couldn't support it, and I signed it not knowing what I was signing. They got me when I had come off work [evidently she had then returned to work] and I was tired anyway and despondent. I just went ahead and signed the paper." She said she never read it and that she never went before a notary public. The petitioner grandmother, on the other hand, testified: "A. Well, *he* wrote me a letter after they left here and went to Kansas City." (By her attorney) "*She* you mean." "A. [The grandmother] V—— [the mother] wrote me a letter which I have lost in the meantime, she wrote me a letter and asked me if I wanted this child when it was born, and if I did she would let me have it. And so the afternoon that she went to the hospital my son called me and told me, he said 'Mama, would you come up and take care of the child while she was in the hospital.'" She went, and when the mother came home from the hospital she presented her with the child and his clothing. Two weeks later she went back to Kansas City with the printed form of consent to adoption and "*he*" hunted up a notary public, and he (the father) and mother went with her to a notary public and both signed the statement. Since then she has had physical custody except for two periods of visitation with his mother, brother, and sisters—one for two weeks and one for three days—which were arranged by the attorneys.

There is no question that there is considerable affection between the grandmother and the child. By trial time he was in school. He is a bright, intelligent boy. The way of life in regard to care of the child is that the grandmother arises in the morning and gets him off to school. Some days he comes home to lunch, and she fixes it. She goes on duty at the hospital at 2:30 in the afternoon. After school the boy goes to the home of an uncle (another son of the petitioner), eats the evening meal, and goes to bed. After the grandmother gets off work at 11 P.M., she goes to the uncle's house, arouses the boy, takes him to her home, and puts him to bed again. Besides the forty dollars per month payments and taxes, which the grandmother is required to pay out of her one hundred sixty dollars per month salary, she also pays the uncle, whose family keep the boy from the time he is out of school until she returns from work at 11 P.M., the sum of ten dollars per month, which she says is to apply on the "rent." She, likewise, has applied for ADC on account of this child but has been refused, no doubt because of uncertainty as to the right to custody.

There is a presumption that the natural parent is fit and qualified to have the custody of his or her child.[4] And the right of the parent to such is not to be interfered with unless it clearly appears that

4. 2 C.J.S. Adoption of Children § 21, pp. 383, 384; Cox v. Carapella, Mo.App., 246 S.W.2d 513; Morris v. McGregor, Mo.App., 269 S.W.2d 171.

such parent has forfeited his or her right and the best interests of the child will be served by allowing the adoption.[5] Consent to adoption, like any other instrument, must be understandably given and free from legal fraud or duress. In adoption cases there is recognized a somewhat indefinite and shadowy border area which for want of better words can be called duress "by force of circumstances." [6]

We have gone into considerable detail in the evidence to show the whole circumstances surrounding the transfer of custody to the grandmother and the execution of the "consent" upon which respondent relies. It appears to us that both the mother and the grandmother are victims of circumstances over which neither of them has had much control. The primary responsibility for these circumstances rests upon him who is the father of the child and son of the petitioner.

■ We think *all* the evidence shows that the natural mother has struggled to make a home for the children and is now doing well in the rearing of the three children she has. The force of circumstances pried the infant G—— away from her, and circumstances prevented her from recovering it until she was free of her husband and was receiving financial assistance.

While we respect the grandmother's valiant efforts, we believe that the circumstances under which she lives and is required to work are not conducive to a normal home life for a child. She who is seeking to become the adoptive mother cannot be with him after school or share his evenings. During the period in which it is customary for families to be together, it is necessary that the boy be "farmed out" to another family.

Then, the grandmother has passed the half-century mark. As the child grows and his needs for supervision, counselling, discipline, and understanding increase, she also will be growing older. She will not be in the age group of the parents of his associates. While circumstances often require that grandparents once again assume the roles and problems of parents, it is often a burden to them and not ordinarily desirable. Mother Nature provides against the too-elderly parent by limiting the period in which women can bear children.

There is the added factor that the father, who has thus far assumed little responsibility, will soon be, or already has been at the time this is written, discharged from the penitentiary. If history repeats itself, he will again be back at the home of his hardworking and solicitous mother. Because the grandmother is required to be at work a considerable portion of the time, there is some question as to whether or not the principal custody, and influence, will be in the father.

■ Turning over the coin again: We think that it is desirable that a child, where there are brothers and sisters, be reared in the give-and-take atmosphere of the family, rather than be separated from them and reared as an only child. All things being equal, it is better that families be kept together (I—— v. B——, Mo.App., 305 S.W.2d 713, 720). We have not overlooked the principle of "equitable estoppel" and "ties of affection" which inhibits the revocation of consent for adoption as against those who have taken a child in good faith with intention of adopting and have expended love, energy, and time in attempting to fulfil that end. If the grandmother regarded the paper, signed in blank and presented only after her son had gone

---

5. In re Cole, Mo.App., 274 S.W.2d 601; I—— v. B——, Mo.App., 305 S.W.2d 713, 719; In re J.—— L.—— H.——, Mo. App., 373 S.W.2d 635; In re Slaughter, Mo.App., 290 S.W.2d 408(6); In re Perkins, 234 Mo.App. 716, 117 S.W.2d 686, 691.

6. Adoption of McKinzie, Mo.App., 275 S.W.2d 365, 372; Adoption of J. M. K., Mo.App., 363 S.W.2d 67, 74; see In re Watson's Adoption, 238 Mo.App. 1104, 195 S.W.2d 331, 336.

to the penitentiary and the mother was insisting upon return of the child, as a sincere step in the actual adoption process, she waited a long time to act upon it. During a part of that interim period her son had lived with her in the same house. The families, at least some of the time, lived in the same vicinity, and there had been some visiting. At one time while the mother had a job in the garment factory at Galena, and after the birth of the last child, she, the grandmother, kept this (last) child for two weeks. She was familiar enough with the other grandchildren (the brother and sisters of G——) to describe them as "wonderful" and "as sweet as can be." The evidence justifies the belief that, in keeping and caring for the infant here involved, she was doing so, not as an adoptive parent, or with any complete intention of becoming one, but as a helpful grandmother and mother, hopefully waiting for the time when her son would get on his feet and be able to meet the responsibilities of parenthood. (Compare Ex parte De Castro, 238 Mo.App., 1011, 190 S.W.2d 949). To be sure, there are ties of affection, but there are ties of love and affection between almost all grandparents and grandchildren. The restoration of a child to his mother and his brother and sisters should not destroy those ties. Nor do we see the terrific emotional wrench which sometimes occurs (and is therefore to be avoided if possible) when a child is torn from the arms of those he loves and is placed in the hands of strangers. As stated, the parties have lived a part of the time in the same vicinity, and they are not strangers. The evidence is that when the child visited his family on the two occasions arranged by the attorneys, the children played together happily. We think the adjustment can easily be made if neither the mother nor the grandmother allows herself to become so blinded by this unpleasantness that she permits prejudice to interfere with the welfare of the children. Visitation on both sides should be invited and encouraged—and enjoyed.

Our view is that the petition for adoption should be denied and that the custody of the child should be remanded to the appellant, his mother. However, we have another complication: It is now nearing the end of another school term. We presume that G—— is in school. We are in some doubt whether his welfare will be best promoted by transferring him from one school to another until the end of the school year, or whether the present circumstances require the immediate transfer of custody.

Accordingly, it is our judgment that the adoption prayed in our case No. 8379 be denied and the judgment reversed outright. That the judgment in the custody case (our case No. 8360) be remanded for further proceedings and orders not inconsistent with this opinion.

STONE and HOGAN, JJ., concur.