v.

**D.J. (Mother), Appellant.**

**No. WD 75852.**

Missouri Court of Appeals,
Western District.

July 30, 2013.

Anna K. Lingo, Columbia, MO, for Respondent.

Elizabeth K. Magee, Columbia, MO, for J.M.J., and David F. Barrett for Appellant.

Before Division Three: LISA WHITE HARDWICK, Presiding Judge, MARK D. PFEIFFER and CYNTHIA L. MARTIN, Judges.

D.J. ("Mother") appeals the juvenile court's judgment terminating her parental rights to her daughter, J.M.J., and granting the petition of J.M.J.'s maternal grandfather, R.W., and step-grandmother, M.W., (referred to collectively as "Grandparents"), to adopt J.M.J. On appeal, Mother contends the juvenile court should have dismissed the adoption petition for lack of jurisdiction because J.M.J. was already the subject of letters of guardianship issued by the probate court. Mother also argues the evidence was insufficient to support the court's finding that she abandoned and neglected J.M.J. Lastly, Mother asserts that the termination of her parental rights and adoption violated Missouri's public policy against dividing the custody of siblings. For reasons explained herein, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

On appeal, we view the evidence and all reasonable inferences therefrom in the light most favorable to the judgment. *In re H.D.J.K.*, 336 S.W.3d 516, 517 n. 2 (Mo.App.2011). The evidence at trial was that J.M.J. was born on October 22, 2002, to Mother and A.J.[1] In early 2006, Mother and J.M.J. were living in an apartment in Holts Summit. J.M.J. started spending approximately three or four days each week with Grandparents because they were concerned about the care that Mother was providing her. Specifically, Grandparents were not comfortable with the people with whom Mother left J.M.J. when Mother was working. Additionally, Grandparents observed that Mother's apartment was cluttered and dirty, and Grandparents were worried that Mother was not adequately supervising J.M.J., feeding her, or caring for her needs. They noticed that J.M.J. was frequently wearing soiled diapers, had rashes, eczema, and another untreated skin problem on her body, and was unkempt. Grandparents also noticed that J.M.J. had bites all over her, which Mother said were from carpet mites.

In February 2006, there was a fire at Mother's apartment. After the fire, Grandparents offered to let Mother and J.M.J. move into their house. Mother agreed that J.M.J. could stay at Grandparents' house. Mother, however, chose to stay at a hotel provided by the Red Cross and at the Salvation Army shelter with her boyfriend, A.H., who was a registered sex offender.

When Grandparents discovered that A.H. was a registered sex offender, they advised Mother of their concerns about him being around J.M.J. Mother was dismissive of their concerns and told them that J.M.J. was safe around A.H. because

---

1. The court also terminated A.J.'s parental rights. Although Mother and A.J. are married, she cannot remember when she last had any contact with him. A.J. is in default and does not appeal the adoption or termination of his parental rights.

Mother slept with J.M.J. in her arms when A.H. stayed the night, so there was no way that A.H. could touch J.M.J. Mother also claimed that A.H.'s sex offender status was not his fault but, instead, was the fault of the victim children's mother, with whom he was using crack cocaine.

Because of their ongoing concerns, Grandparents filed for and received emergency legal guardianship of J.M.J. in probate court. For a period of time afterwards, Mother worked with Children's Division to try to regain placement of J.M.J. with her. She found an apartment in Holts Summit, got a job at McDonald's, and worked with a parent aide. Mother soon learned, however, that she was pregnant with A.H.'s child, L.J., who was born in December 2006. She quit her job and was evicted from her apartment for having A.H. on the premises. Following a period of homelessness, Mother relocated to Jefferson City.

When J.M.J. first went to live with Grandparents in 2006, she exhibited problematic behaviors, including being clingy, tearing things, refusing to respond to directives, and throwing tantrums during which she would fall to the floor, kicking and screaming. As a result, Grandparents enrolled her in therapy with Jennifer Patrick, a licensed clinical social worker. Patrick initially provided therapy to J.M.J. from June 20, 2006, through March 9, 2007. During that time, J.M.J.'s behavior improved, but she continued to have behavioral problems after she had contact with Mother. Patrick next provided therapy to J.M.J. from July 19, 2007, through October 29, 2007. Over the course of those three months, Patrick attempted to do family therapy sessions with Mother and J.M.J. in addition to J.M.J.'s individual therapy sessions, but Mother attended only two of six scheduled sessions. During both the individual and family therapy sessions, J.M.J. expressed that she wanted Mother to be more consistently involved in her life and activities.

Early in the emergency guardianship, Mother had regular visits with J.M.J. several times a week, for several hours each visit. For most of these visits, Grandparents would pick up Mother, bring her to their house, and take Mother back to her residence after the visit. Although Mother visited with J.M.J. on a regular basis, she was not otherwise parenting her, as she never helped prepare J.M.J.'s food, give her a bath, clean the house, do her laundry, or assist in any other way with the day-to-day chores of caring for her.

In late 2007, Grandparents requested legal guardianship of J.M.J. Mother opposed the request. Following a hearing, the court found that Mother, by her actions, had shown that she was unwilling and unable to assume the duties of parenting J.M.J. Consequently, the court granted letters of guardianship to Grandparents on October 30, 2007.

In 2008 and 2009, Mother was in a relationship with A.W., whom she described as having a permanent brain injury from being hit by a car. According to Mother, she and A.W. argued and did not get along, and he was once arrested for throwing food at her. Their relationship ended shortly after their son, M.J., was born in September 2009, but Mother continues to occasionally leave L.J. and M.J. alone in A.W.'s care. In 2010, Mother allowed another man, S.S., whom she had met the year before, to move into her home after reuniting with him at the Salvation Army. S.S. sodomized L.J. on July 26, 2010, for which he later pled guilty and was sentenced to fifteen years in prison. According to Mother, she was not responsible for L.J.'s being molested because she was asleep when it happened. After S.S. sodomized L.J., Grandparents stopped allow-

ing J.M.J. to have unsupervised visits with Mother but continued to attempt to arrange supervised visits with her.

Additionally, Grandparents again offered to pay any uncovered costs for therapy for J.M.J. and Mother. J.M.J. resumed therapy with Patrick in September 2010. J.M.J. was "pretty horrified" by what S.S. had done to L.J., and L.J. was acting out sexually in front of J.M.J. J.M.J. expressed to Patrick that she was worried that L.J. and M.J. were not safe at Mother's house because Mother did not "let good people in the house." Mother attended two more family therapy sessions with J.M.J. When Mother failed to show up or call for a third session, however, Patrick stopped scheduling family sessions with her. According to Patrick, Mother was not engaged in the therapeutic process, did not work with Patrick to address J.M.J.'s therapeutic issues, was not meeting J.M.J.'s emotional needs, did not take responsibility for J.M.J.'s going to live with Grandparents in the first place, and did not indicate any ways she might make her home a safe and appropriate place for J.M.J. in the future. Patrick believed that the possibility of returning to Mother's home caused a lot of anxiety for J.M.J., who does not feel close to Mother and does not feel safe in Mother's home.

Other evidence at trial showed that, over the course of the guardianship, Mother's visits with J.M.J. became increasingly sporadic. At times, Mother went for two to four weeks without contacting Grandparents or J.M.J. Even after Grandparents tried to designate a specific day each week for visitation, Mother's participation in the weekly scheduled visits was sporadic. Over the last three years of the guardianship, J.M.J. frequently expressed to Grandparents that, while she wanted to see her half-siblings, she did not want to see Mother or talk to her on the phone.

Grandparents had to convince J.M.J. to do so. During the visits Mother and J.M.J. did have, Grandparents noticed that Mother appeared to be more interested in talking to them instead of to J.M.J., and Mother and J.M.J. did not interact like a parent and child. J.M.J. described her relationship with Mother as "horrible."

While living with Grandparents, J.M.J. completed kindergarten through third grade. Although Grandparents provided Mother with J.M.J.'s school information, Mother did not attend any parent-teacher conferences. Except for attending one of J.M.J.'s school programs when she was in first grade, Mother did not participate in any of her school functions or attend any school programs. Mother never helped J.M.J. with homework and never asked Grandparents about how J.M.J. was doing in school.

J.M.J. was also involved in several extracurricular activities, including soccer, dance, gymnastics, cheerleading, and softball. For each activity, Grandparents provided Mother with schedules for practices and games. Mother attended two of J.M.J.'s soccer games in the past four years and never made any financial contribution toward J.M.J.'s extracurricular expenses. Additionally, Mother did not attend any of J.M.J.'s church programs.

Mother never gave any direct financial support for J.M.J. to Grandparents, although she did give J.M.J. donated clothing on a couple of occasions. Mother did not give J.M.J. any Christmas presents, but she did give her a birthday present in 2010 and 2011. Grandparents hosted and paid for all of J.M.J.'s birthday parties and invited Mother, L.J., and M.J. to attend, which they did.

Grandparents also paid for all of J.M.J.'s medical needs that were not covered by insurance. During the guardianship, J.M.J. had a dental procedure, two medical

procedures, and was hospitalized for her appendix. Mother did not attend any of the procedures or visit J.M.J. in the hospital. Mother attended a couple of doctor's appointments for J.M.J. when she was four or five years old but did not attend any appointments after that time.

Mother was unemployed during the majority of the guardianship and never held a job for more than six months. Grandparents bought Mother a car for her to use to visit J.M.J., but Mother used the car to drive other people around. Grandparents also provided food and other financial assistance to Mother, and she received food stamps. Instead of using the food that Grandparents gave her to feed her children, Mother used the food and some of her food stamps to feed the other people that she let live in her house. At some point, Mother let a woman, who was both a drug addict and prostitute, and her children live in the house for a while, and she also let another woman and her children live in the house before the woman's children were taken away from her.

Eventually, J.M.J. began asking Grandparents to adopt her. After initially resisting her request, Grandparents filed their petition to adopt J.M.J. and terminate Mother's parental rights in October 2010. Trial was held on Grandparent's petition on June 29, July 13, and September 12, 2012. Following the trial, the court entered its judgment granting Grandparents' adoption petition and terminating Mother's parental rights. Mother appeals.

### STANDARD OF REVIEW

A prerequisite to an adoption under Chapter 453 is the natural parents' consent or the involuntary termination of their parental rights. *In re C.M.B.R.*, 332 S.W.3d 793, 819 (Mo. banc 2011). In this case, the court involuntarily terminated Mother's parental rights. We review whether there was clear, cogent, and convincing evidence to support a statutory ground for terminating parental rights under *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *In re C.M.B.R.*, 332 S.W.3d at 815. Thus, we will affirm the circuit court's judgment unless there is no substantial evidence to support it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy*, 536 S.W.2d at 32. We view the evidence in the light most favorable to the court's judgment, deferring to its credibility determinations and resolutions of conflicts in the evidence. *In re C.M.B.R.*, 332 S.W.3d at 815. " 'Greater deference is granted to a trial court's determinations in custody and adoption proceedings than in other cases.' " *Id.* (citation omitted).

### ANALYSIS

### *Juvenile Court's Authority to Proceed on Adoption Petition*

In Point I, Mother contends the juvenile court erred in failing to dismiss the adoption petition because J.M.J. was already the subject of letters of guardianship issued by the probate court. Before trial, Mother filed a motion to dismiss the case on the basis that the "concurrent jurisdiction doctrine" prohibited the juvenile court from proceeding on the adoption petition because J.M.J. was the subject of letters of guardianship in the probate court. The juvenile court took Mother's motion to dismiss with the case. On appeal, Mother argues that, because the probate court was the first court to exercise jurisdiction in the guardianship proceeding, the juvenile court lacked jurisdiction to proceed on the adoption proceeding.

Mother's contention that the juvenile court lacked jurisdiction to proceed on the adoption petition is based upon the "concurrent jurisdiction doctrine," as discussed

in *In re Moreau*, 161 S.W.3d 402 (Mo.App. 2005). In *Moreau*, a father filed a petition in the probate court to terminate letters of guardianship issued to his son's grandparents. *Id.* at 404. The father also filed a petition in the circuit court for custody of his son following the dissolution of his marriage to the child's mother. *Id.* After consolidating the petitions for trial, the court denied the petition to terminate the guardianship and awarded third-party custody of the child to the grandparents. *Id.* at 405.

On appeal, the Southern District found that both the probate court and the circuit court had subject matter jurisdiction, personal jurisdiction, and the statutory authority[2] to render a judgment concerning the child's custody. *Id.* at 406. Nevertheless, the court found that the circuit court erred in proceeding on the petition for custody because the probate court had already exercised its jurisdiction in the guardianship proceeding. *Id.* at 407. The court explained that the circuit court "ran afoul of the concurrent jurisdiction doctrine," which provides that, " 'if two courts can exercise jurisdiction over a particular person and subject, the court that first exercises such jurisdiction does so to the exclusion of subsequent intervention by the second court.' " *Id.* (citation omitted). Applying this doctrine, the court ruled that the probate court had "exclusive jurisdiction" over the child's custody and that the circuit court "lacked jurisdiction" to rule on the custody petition. *Id.*

The Western District subsequently discussed *Moreau's* holding in *Kelly v. Kelly*, 245 S.W.3d 308, 313 (Mo.App.2008), and concluded that it was "in some sense a misnomer to describe the concurrent jurisdiction doctrine as depriving one court of jurisdiction." Instead, " '[c]oncurrent jurisdiction' is simply a phrase describing the legal reality that more than one court has the legal authority to decide a matter." *Id.*[3] We explained that, because both the circuit court and probate court had subject matter and personal jurisdiction, the real issue in *Moreau* was not whether the circuit court lacked jurisdiction, but whether the circuit court committed an error of law by exercising its authority to rule on the child's custody during the pendency of the probate proceeding. *Id.* at 315. Where multiple courts have subject matter and personal jurisdiction over the issue and the parties, a court commits an error of law if exercising its authority to enter a judgment in the case results in wasteful duplication or inconsistent judgments. *Id.* at 314–15. Thus, we held that the circuit court in *Kelly* committed an error of law when it entered a modification judgment awarding parents joint legal custody of a child, with sole physical custody to the child's father, before terminating a guardianship order that the grandparent-guardians admitted was no longer necessary. *Id.* at 315–16. In so holding, we noted that the court "should have taken steps to consolidate the two proceedings both for

---

**2.** The court in *Moreau* refers to this authority as *"jurisdiction* to render the particular judgment in this particular case." *Id.* at 406 (emphasis added). *Moreau* was decided before the Supreme Court's decision in *J.C.W. ex rel. Webb v. Wyciskalla*, 275 S.W.3d 249 (Mo. banc 2009). In *Webb,* the Court clarified that this is not an issue of jurisdiction but, rather, is simply an issue of whether the court has the statutory authority to render a particular judgment in a particular case. *Id.* at 254.

**3.** As noted in both *Moreau* and *Kelly:* "In Missouri, the custody of a child may be adjudicated in at least five types of actions: (1) dissolution; (2) habeas corpus; (3) juvenile; (4) guardianship; and (5) paternity." *Moreau,* 161 S.W.3d at 405–06; *Kelly,* 245 S.W.3d at 313.

purposes of judicial efficiency and avoidance of inconsistent judgments." *Id.* at 316.

■■ The juvenile court's proceeding on the adoption petition in this case did not implicate the concerns expressed in *Kelly*. Under the circumstances, adoption was an appropriate legal remedy following the six-year guardianship. The granting of letters of guardianship over a minor "is done as a stop-gap measure to provide for the care and custody of a minor for the period of time when the natural guardian-parent is unable, unwilling, or unfit to perform this parental function." *Flathers v. Flathers*, 948 S.W.2d 463, 468 (Mo.App.1997). Where a parent cannot rehabilitate and reassume her parenting responsibilities within a reasonable time, the appropriate legal remedy may no longer be a guardianship but, instead, may be an adoption.

Rather than result in inconsistent judgments, the court's granting Grandparents' adoption petition terminated Mother's and A.J.'s rights and eliminated the necessity of the guardianship. Section 453.090.1[4] provides that an adoption under Chapter 453 terminates "all legal relationships and all rights and duties between such child and his natural parents," and that "[s]uch child shall thereafter be deemed and held to be for every purpose the child of his parent or parents by adoption, as fully as though born to him or them in lawful wedlock." As a guardianship presumes the need to provide the child protection from unfit, unable, or unwilling parents, an order effectively terminating the unfit, unable, or unwilling parents' legal rights simultaneously negates the need for continued relief under the probate code.

Moreover, from a practical standpoint, the juvenile court's order granting the adoption did not contradict the probate court's order because it did not transfer the actual custody of J.M.J. from Grandparents. The juvenile court took judicial notice of the probate court's file and, therefore, was well aware of the status of the guardianship. If Grandparents' adoption petition had been denied, the letters of guardianship awarding Grandparents custody of J.M.J. would have remained intact, as there was no action pending to terminate or amend the guardianship. There was no possibility of custody reverting to Mother in the adoption proceeding and, consequently, no possibility of conflicting orders.[5] Grandparents were going to remain J.M.J.'s legal custodians under any possible scenario, either through an adoption decree or in accordance with the underlying letters of guardianship. Therefore, the juvenile court did not err in exercising its authority to proceed on the adoption petition. Point I is denied.

### Sufficiency of Evidence of Abandonment and Neglect

In Point II, Mother contends the evidence was insufficient to support the court's finding that she abandoned and neglected J.M.J. She argues that any failure to support J.M.J. on her part was the result of her impoverishment and the familial tension between her and Grandparents.

In its judgment, the court concluded that Mother's consent to the adoption was not required pursuant to Section

---

4. All statutory references are to the Revised Statutes of Missouri 2000.

5. This is not to say that the potential concerns stemming from concurrent jurisdiction, that is, judicial inefficiency and inconsistent judgments, are never implicated where the child is the subject of both an adoption proceeding and letters of guardianship. Our determination that these concerns are not present here is based upon the particular circumstances of this case.

453.040(7). Section 453.040(7) provides, in pertinent part, that a parent's consent to an adoption is not required where, for a period of at least six months immediately prior to the filing of an adoption petition, a parent willfully abandoned the child or willfully, substantially, and continuously neglected to provide the child with necessary care and protection.

The terms "abandonment" and "neglect" in this statute are used in the disjunctive; hence, "either ground, if supported by substantial evidence, will obviate the need for parental consent" to an adoption. *In re K.L.C.*, 9 S.W.3d 768, 772 (Mo.App.2000). Abandonment and neglect are distinct, but not mutually exclusive, concepts. *Id.* "Abandonment is defined as the voluntary and intentional relinquishment of the custody of a child with the intent to never again claim the rights or duties of a parent." *Id.* at 772–73. Abandonment is also defined as "the intentional withholding by the parent of his or her care, love, protection and presence, without just cause or excuse." *Id.* at 773. Neglect, on the other hand, "focuses on physical deprivation or harm, and has been characterized as 'a failure to perform the duty with which the parent is charged by the law and by conscience.'" *In re C.M.B.*, 55 S.W.3d 889, 894 (Mo.App.2001) (citation omitted). " 'Neglect' is ultimately a question of an intent to forego 'parental duties,' which includes both an obligation to provide financial support for a minor child, as well as an obligation to maintain meaningful contact with the child." *Id.* "In both neglect and abandonment[,] the issue turns on intent," which is inferred from the parent's conduct before, during, and after the six-month period preceding the filing of the adoption petition. *Id.*

The court made several findings to support its determination that Mother had abandoned and neglected J.M.J. The court found that Mother had not provided any regular, consistent, or meaningful financial support for J.M.J. The evidence on this issue was that, aside from two birthday presents and some donated clothing on two occasions, Mother gave no financial support for J.M.J. to Grandparents during the six-year guardianship.

Mother argues that her failure to provide any support was due to her impoverishment. While that may be true, the record, in the light most favorable to the judgment, indicates that Mother's impoverishment was due to her inability to hold a job. Grandparents tried to help Mother get a job by driving her around to fill out applications and by employing her at R.W.'s company, but Mother was unable to keep any job for more than six months. Moreover, there was evidence that Mother used whatever resources she had to help care for her friends and the people she let live in her house.

The court also found that Mother had not provided any significant or meaningful emotional support for J.M.J. While Mother visited J.M.J. several times a week when Grandparents initially obtained the emergency guardianship, Mother's contact and visits with J.M.J. became increasingly sporadic. Despite Grandparents' willingness to provide Mother with transportation for the visits, Mother would go for several weeks at a time without contacting them. When Mother did visit, she was more interested in talking to Grandparents rather than to J.M.J., and she and J.M.J. frequently clashed. Mother contends J.M.J. rejected her attempts at emotional support because of her impoverishment. The testimony from J.M.J.'s therapist, however, indicates that Mother was not meeting J.M.J.'s emotional needs and did not commit to improving their relationship.

Related to Mother's failure to provide emotional support, the court also found

that Mother failed to have any meaningful involvement in J.M.J.'s medical care, school, and activities. The record indicates that, during the last five years of the guardianship, Mother did not attend any of J.M.J.'s medical appointments, including a hospitalization and three surgical procedures. Mother exhibited a lack of interest in J.M.J.'s education, as she attended only one of J.M.J.'s school programs in the past four years and never attended any parent-teacher conferences or inquired about how J.M.J. was doing in school. She exhibited a similar lack of interest in J.M.J.'s extracurricular activities.

Additionally, the court found that Mother failed to create a safe home environment for J.M.J. Over the course of the guardianship, Mother allowed into her home individuals who posed safety risks to her children, including: a registered sex offender; a man with a criminal history and mental health issues, whom she also allowed to serve as a child care provider for L.J. and M.J.; a prostitute and drug addict; a woman whose children were taken away from her; and a man who subsequently sodomized L.J. Although Mother argues that any evidence of the care she provided to L.J. and M.J. during the guardianship was irrelevant, the court was entitled to consider those facts in considering the welfare of J.M.J. See *In re A.K.S.*, 602 S.W.2d 848, 851 (Mo.App.1980) (stating that "[t]he harm to a sibling, potential in the harm done to another child, is sufficient to justify intervention of the court to remove the sibling from the harmful environment.").

■■■ Mother asserts that she could not have abandoned J.M.J. because Grandparents were providing adequate care for her through the guardianship. "It is true that abandonment is generally not compatible with a case where custody has been taken from a parent involuntarily by court

order." *In re C.M.B.*, 55 S.W.3d at 895. However, a custody transfer for any reason may turn into abandonment if the absent parent foregoes the performance of parental functions, thereby demonstrating the intent to never again exercise the rights and duties of a parent. *In re H.M.C.*, 11 S.W.3d 81, 87 (Mo.App.2000). Even without considering her failure to provide any meaningful financial support, Mother's conduct over the course of the guardianship, e.g., the increasingly sporadic nature of her visits and her lack of interest in J.M.J. during those visits, her unwillingness to fully participate in J.M.J.'s therapy to improve their relationship, her lack of participation in J.M.J.'s medical care, her lack of interest and participation in J.M.J.'s school and activities, and her unwillingness to provide a safe home environment for J.M.J., indicated her intent to abdicate her parental duties to Grandparents. Any efforts Mother made were, at best, token. "Parents are not allowed to maintain only a superficial or tenuous relationship with their children in order to avoid a determination of abandonment." *In re P.G.M.*, 149 S.W.3d 507, 515 (Mo.App.2004) (internal quotation marks and citations omitted). Clear, cogent, and convincing evidence supported the court's determination that Mother willfully abandoned and neglected J.M.J. Point II is denied.

### Termination and Adoption Divides Custody of Siblings

■■■ In Point III, Mother contends the court erred in terminating her parental rights and allowing Grandparents to adopt J.M.J. because doing so separates J.M.J. from L.J. and M.J., her half-siblings. Mother argues the judgment violates the state's public policy that siblings should be raised together.

The separation of siblings is a relevant factor for the court to consider when determining whether termination of parental rights is in the child's best interests. *M.L.S. v. C.S.*, 710 S.W.2d 452, 454 (Mo.App.1986). Generally, "it is desirable that a child, where there are brothers and sisters, be reared in the give-and-take atmosphere of the family, rather than be separated from them and reared as an only child." *In re G.*, 389 S.W.2d 63, 69 (Mo.App.1965). Thus, "[a]ll things being equal, it is better that families be kept together." *Id.*

In this case, however, all things are not equal. As discussed in Point II, there was sufficient evidence that Mother had willfully abandoned and neglected J.M.J. well in excess of six months prior to Grandparents' filing their adoption petition. Furthermore, this is not a case where the adopted child and siblings have resided together in a common home. J.M.J. has never lived with her siblings, as L.J. and M.J. were both born after J.M.J. went to live with Grandparents. That J.M.J. has such a close bond with L.J. and M.J., despite never having lived with them, is largely due to Grandparents' efforts to foster the siblings' relationship. Grandparents indicated that they would continue their efforts to preserve this relationship after the adoption. Like J.M.J., L.J. and M.J. are also the grandchildren of Grandparents. Based upon these circumstances, the court did not err in finding that the adoption and resulting termination of Mother's parental rights was in J.M.J.'s best interests. Point III is denied.

#### CONCLUSION

The judgment is affirmed.

ALL CONCUR.